IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RANDY SCOTT BARGER, | ) | Case No. 1:21-cv-138 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION[1]** |

Plaintiff, Randy Scott Barger, seeks judicial review of the final decision of the
Commissioner of Social Security, denying his applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security
Act.  Barger challenges as a violation of the principle of separation of powers the structure of the
Social Security Administration ("SSA"), because, under 42 U.S.C. § 902(a)(3), the
Commissioner does not serve at the will of the president.  Barger additionally contests the
Administrative Law Judge's ("ALJ") denial of benefits.  Barger argues that the ALJ failed to
adequately explain his findings at Step Three of the sequential evaluation process and
misevaluated the opinion evidence and Barger's subjective symptom complaints.  I find that
Barger lacks standing to contest the constitutionality of the ALJ's decision based on the
president's removal authority.  And because the ALJ applied proper legal standards and reached

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Barger's applications for DIB and SSI be affirmed.

## I.      Procedural History

On January 2, 2019, Barger applied for DIB and SSI.  (Tr. 248, 255).[2]  Barger alleged that he became disabled on July 1, 2013, due to: "1. depression; 2. intermittent explosive disorder; 3. ptsd; 4. personality disorder; [and] fibromyalgia."  (Tr. 248, 255, 305).  The SSA denied Barger's application initially and upon reconsideration.  (Tr. 88-123, 128-63).  Barger requested an administrative hearing.  (Tr. 196).

ALJ Joseph G. Hajjar held a telephone hearing on May 1, 2020 and denied Barger's claim in a June 9, 2020 decision.  (Tr. 15-36, 43-87).  At Step Three of the sequential evaluation process, the ALJ determined that Barger did not have an impairment or combination of impairments that met or equaled a listed impairment.  At Step Four, the ALJ determined that Barger had the residual functional capacity ("RFC") to perform light work, except:

> [Barger] can frequently handle and finger bilaterally, he can frequently climb ramps and stairs, he can never climb ladders, ropes, and scaffolds, he can frequently stoop, kneel, crouch, and crawl, he can never work at unprotected heights, near dangerous moving machinery, or engage in commercial driving, he can tolerate no more than frequent exposure to dust, odors, fumes, and pulmonary irritants, extreme cold, and extreme heat, he can perform work with no strict production rate pace requirements with only occasional interaction with supervisors, coworkers, and the public, and only routine workplace changes.

(Tr. 21-22).

Based on vocational expert testimony that someone with Barger's age, experience, and RFC could perform other work, the ALJ determined that Barger wasn't disabled and denied his application.  (Tr. 35-36).  On November 18, 2020, the Appeals Council denied further review,

---

[2] The administrative transcript appears in ECF Doc. 11.

rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On January 18, 2021, Barger filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Barger was born on September 6, 1976 and was 36 years old on the alleged onset date. (Tr. 88, 248).  He completed high school and attended two years of college.  (Tr. 51, 306). Barger had past work as an interior home painter, used car salesman, and auto dealer finance manager, but the ALJ determined that Barger was unable to perform his past relevant work.  (Tr. 34, 51-53, 55-56, 296).

### B.     Relevant Medical Evidence

#### 1.     Physical Impairments

On October 21, 2013, Barger visited Erin Nagrant, MD, at the Cleveland Clinic for back trauma.  (Tr. 520).  Barger reported that the day before he had lifted a couch and washing machine by himself.  *Id.*  Barger stated that the next day he couldn't get out of bed and the pain radiated down his left calf.  *Id.*  Dr. Nagrant diagnosed Barger with an acute back strain and prescribed a Medrol Dosepak, over-the-counter medication, muscle relaxants, and Percocet.  (Tr. 521).

On October 28, 2013, Barger returned to Dr. Nagrant for a follow-up, reporting continued low back pain with radiation down his left leg.  (Tr. 519).  Barger stated that on four occasions his leg gave out on him and he nearly fell.  *Id.*  He also reported tingling sensations in his left foot.  *Id.*  Upon examination, Barger had pain to palpation, limited back extension and flexion, very limited left hip flexion and extension, and paraspinal muscle tenderness.  (Tr. 520).

Dr. Nagrant prescribed Percocet, ibuprofen, and cyclobenzaprine and ordered an MRI. *Id.* Barger cancelled his subsequent appointments with Dr. Nagrant. (Tr. 518-19).

On November 2, 2013, Barger presented to Southwest General's emergency department with back pain and leg swelling that had begun five days earlier. (Tr. 956). Barger reported left-sided thoracic pain that radiated down to his calf, mild left leg swelling, and numbness in his foot. (Tr. 956). Upon physical examination, Barger had decreased back range of motion secondary to pain, left-sided paraspinal muscle spasm, and pain to palpation. (Tr. 958). X-ray testing showed normal results. (Tr. 954-55). Barger was diagnosed with acute low back pain, leg swelling, and sciatica and was discharged in stable condition, with prescriptions for Vicodin and a Medrol Dosepak. (Tr. 958).

On March 23, 2017, Barger returned to the Cleveland Clinic, reporting muscle spasms in his back that had been occurring intermittently over the prior two months.[3] (Tr. 446). Barger stated that his pain was "improved/resolves" with stretching and ibuprofen. *Id.* On physical examination, Barger had unremarkable results. (Tr. 447). The attending nurse practitioner diagnosed back muscle spasms, instructed Barger to continue using NSAIDs, and prescribed cyclobenzaprine. (Tr. 448).

On November 29, 2017, Barger visited the Cleveland Clinic, reporting cramping in his low back and legs. (Tr. 445). On physical examination, Barger had unremarkable results. (Tr. 445-46). The attending physician prescribed Robaxin for Barger's spasms. (Tr. 446).

On April 17, 2018, Barger visited Kurtis Dornan, MD, with his wife, for an evaluation of whole-body muscle aches/spasms. (Tr. 443-44). Barger stated that he'd had symptoms for

---

[3] Barger's treatment history between November 2, 2013 and March 23, 2017 concerned gastrointestinal pain, diverticulitis, gallbladder pain, and respiratory problems, the consideration of which Barger does not challenge. *See* (Tr. 448-518, 979-93, 1007-08, 1012-16); *see generally* ECF Doc. 13.

4

years, but his symptoms had been worse over the preceding five to six months. (Tr. 444). Barger had symptoms of malaise/fatigue, abdominal pain, back pain, joint pain, myalgias, and weakness. *Id.* Barger's physical examination results were unremarkable except for "generalized tenderness." *Id.* Dr. Dornan diagnosed Barger with myalgia and polyarthralgia, prescribed valium, and ordered testing to rule out infection, anemia, thyroid dysfunction, autoimmune disease, and muscle breakdown. (Tr. 444-45).

On May 1, 2018, Barger returned to Dr. Dornan for a follow-up, reporting continued whole-body pain and that his cramping had responded to Valium. (Tr. 441). He also reported a history of concussions. *Id.* Barger reported symptoms of malaise/fatigue, joint pain, myalgias, and dizziness. *Id.* Barger's physical examination results were unremarkable. (Tr. 442). His lab work was normal. (Tr. 443). Dr. Dornan continued Barger's medication and ordered an MRI to rule out multiple sclerosis and chronic traumatic encephalopathy. (Tr. 442).

On May 30, 2018, Barger underwent MRI examination, the results of which were unremarkable. (Tr. 567-68).

On June 12, 2018, Barger visited Dr. Dornan for a follow-up, reporting that his pain was concentrated in his joints more than in his muscles. (Tr. 436). His physical examination results were unremarkable. (Tr. 437). Dr. Dornan noted that Barger's MRI results were normal and stated that Barger might have fibromyalgia. (Tr. 436-37). Dr. Dornan prescribed gabapentin and Valium to treat Barger's myalgia and referred Barger for a rheumatology evaluation. (Tr. 437).

Between June 12, 2018 and March 4, 2019, Barger regularly visited Dr. Dornan for follow-up appointments. *See* (Tr. 401-34, 740-42). On July 20, 2018, Barger reported to Dr. Dornan, that although gabapentin provided some relief, working for short periods would cause sweat, which would also cause cramps. (Tr. 434). Barger also reported symptoms of

malaise/fatigue and myalgias.  (Tr. 436).  Barger's physical examination results were unremarkable.  (Tr. 435).  And Dr. Dornan increased Barger's gabapentin dosage.  *Id*.  During a July 31, 2018 follow-up, Barger reported "slow and steady improvement" in his cramping, and Dr. Dornan increased the dosage of gabapentin.  (Tr. 433-34).

On August 14, 2018, Barger reported to Dr. Dornan that his cramping had "significantly improved."  (Tr. 431).  However, he had generalized tenderness throughout his upper and lower extremity muscles.  (Tr. 432).  Dr. Dornan diagnosed Barger with chronic fatigue syndrome with fibromyalgia.  (Tr. 432-33).  During an August 30, 2018 follow-up, Barger reported that his cramps were less intense on gabapentin and he felt "things are moving in [the] right direction."  (Tr. 430).  His physical examination results were unremarkable, and Dr. Dornan stated that Barger was "stable on medication."  (Tr. 431).

On September 28, 2018, Barger reported to Dr. Dornan that he had reached a plateau on his current dose of gabapentin.  (Tr. 423).  Dr. Dornan increased Barger's gabapentin dosage.  (Tr. 424).  On December 6, 2018, Barger reported that he no longer got relief from gabapentin and continued to have moderate to severe myalgia/cramping.  (Tr. 420).  Barger also reported symptoms of fatigue, arthralgias, and myalgias.  (Tr. 421).  Dr. Dornan discontinued gabapentin and started Barger on Lyrica.  *Id.*

On January 7, 2019, Barger reported to Dr. Dornan some improvement in his cramps with Lyrica, though he also reported worsening joint pain.  (Tr. 403).  Dr. Dornan continued Barger's Lyrica and added meloxicam.  *Id.*  By February 6, 2019, Barger reported that he felt "stable" on Lyrica and Dr. Dornan stated that Barger was "doing well."  (Tr. 401-02).  Barger's physical examination results during this period were unremarkable.  *See* (Tr. 402, 404, 421-22, 424).

On March 4, 2019, Barger reported to Dr. Dornan that some of his cramping had returned.  (Tr. 742).  Barger reported symptoms of arthralgias and myalgias.  *Id.*  His physical examination results were unremarkable.  (Tr. 743).  Dr. Dornan increased Barger's Lyrica dosage.  *Id.*

On March 26, 2019, Barger visited Margaret Tsai, MD, for a rheumatology evaluation of his joint pain.  (Tr. 735).  Barger reported that he experienced 30-to-60-minute tremor episodes affecting his sides, low back, sternum, hamstrings, calves, upper arms, and hands.  *Id.*  He rated his pain at 10/10 with improvement with Lyrica.  *Id.*  He reported symptoms of: (i) joint pain in the knees, low back, and extremities; (ii) joint swelling in the hands and knees; (iii) stiffness lasting one hour; (iv) low back pain; (v) purple fingertips and toes when cold; and (vi) fatigue.  (Tr. 736-37).  Upon physical examination, Barger had: (i) stiff ambulation; (ii) swollen hand and knee joints; (iii) tender knee, low back, and extremity joints (16/18 tender points in total); and (iv) decreased joint range of motion due to pain.  (Tr. 737-38).  Dr. Tsai determined that Barger had findings consistent with "generalized pain due to chronic fibromyalgia" with pain sites all over his body secondary to osteoarthritis.  (Tr. 738).  Dr. Tsai increased Barger's Lyrica regimen and recommended low-impact weightbearing exercises.  *Id.*

On March 29, 2019, Barger underwent x-ray examination of his knees, cervical spine, lumbosacral spine, and hands.  (Tr. 734).  Barger's x-ray results showed: (i) L4-S1 facet degenerative arthritis; (ii) mild narrowing of the L4-5 disc space with mild-to-moderate L4-5 spinal stenosis; and (iii) mild degenerative arthritis of the small fingers, right index finger, and left ring fingers.  (Tr. 733, 752).

On April 1, 2019, Dr. Tsai informed Barger by telephone of his x-ray results and informed him that he had low vitamin D levels, which could be associated with fatigue, joint pain, and muscle pain.  (Tr. 733).  Dr. Tsai prescribed vitamin D supplements.  *Id.*

On April 10, 2019, Barger visited Dr. Dornan for a follow-up, reporting minimal relief from medication and frustration with his level of pain and difficulty walking.  (Tr. 837).  He also reported several episodes of dizziness, symptoms of arthralgias and myalgias, and unexpected weight change (BMI of 46.36).  (Tr. 837-38).  On physical examination, Barger had unremarkable results.  *Id.*  Dr. Dornan continued medication.  *Id.*

On May 10, 2019, Barger returned to Dr. Dornan, reporting that his cramps were "not as bad" but worsened with strenuous activity.  (Tr. 835).  Barger reported symptoms of fatigue, shortness of breath, palpitations, arthralgias, and myalgias.  (Tr. 836).  Barger's physical examination results were unremarkable.  *Id.*  Dr. Dornan continued Barger's Lyrica regimen.  *Id.*

On June 18, 2019, Barger visited Dr. Tsai for a follow-up.  (Tr. 878).  Barger reported that he stayed up at night because he was uncomfortable.  *Id.*  He stated he had soreness in his right upper extremity at night and the morning, as well as "[l]ots of cramps."  *Id.*  Barger also reported pain rated at 8/10 all over his body and morning stiffness.  *Id.*  Upon physical examination, Barger's results were similar to those on his March 26, 2019 visit.  (Tr. 881); *cf.* (Tr. 737).  Dr. Tsai ordered that Barger consult a physical therapist and pain clinician for long-term treatment.  (Tr. 882).  She also recommended exercising 30 minutes 3 to 5 times per week. *Id.*

On August 16, 2019, Barger returned to Dr. Dornan, reporting no improvement in his cramps.  (Tr. 1209).  Barger reported symptoms of fatigue, arthralgias, and myalgias.  (Tr. 1210).  On physical examination, Barger had generalized tenderness and was morbidly obese (BMI of

46.86).  (Tr. 1210-11).  Dr. Dornan diagnosed Barger with hyperCKmia and ordered a muscle

biopsy.  (Tr. 1211).

On October 2, 2019, Barger reported to Dr. Dornan that he continued to suffer whole-

body pain/cramping and had "significant worsening of control" when his medication changed to

generic Lyrica.  (Tr. 1377).  On physical examination, Barger had unremarkable results except

that he appeared morbidly obese (BMI of 46.7).  (Tr. 1378).  Dr. Dornan refilled Barger's

medication and referred Barger for a muscle biopsy.  (Tr. 1379).

On October 22, 2019, Barger visited Uchenna Anaje, CNP, for a preoperative

examination.  (Tr. 1104).  Barger reported experiencing whole-body muscle cramps for over a

year, which sometimes affected his thought and made it difficult to breathe.  *Id.*  Barger stated

Lyrica helped moderately reduce his symptoms, and that he had been recommended for a muscle

biopsy of the left thigh.  *Id.*  On physical examination, Barger had unremarkable results.  (Tr.

1106-07).

On November 1, 2019, Barger underwent a muscle biopsy.  (Tr. 1141-42).  The

pathology report of the skeletal muscle was unremarkable.  (Tr. 1089-91).  Barger was

discharged the following day, after he refused to be monitored for possible sleep apnea.  (Tr.

1109, 1172, 1179).

On November 20, 2019, Barge returned to Dr. Dornan for a follow-up, reporting

moderate to severe whole-body cramps.  (Tr. 1383).  He also reported worsening lower back pain

and symptoms of blurred vision, lower extremity edema, shortness of breath during exertion,

arthralgias, and tingling.  *Id.*  On physical examination, Barger had extremity swelling.  (Tr.

1383-85).  Dr. Dornan stated that the biopsy was nondiagnositic and referred Barger for a

neurology evaluation.  (Tr. 1383, 1385).

On December 19, 2019, Barger reported to Dr. Dornan continued frequent cramping, which interfered with sleep and activities, and no relief with generic Lyrica.  (Tr. 1386).  On physical examination, Barger had unremarkable results except obesity (BMI of 37.56). (Tr. 1387-88).  Dr. Dornan refilled Barger's medication.  (Tr. 1388).

On January 22, 2020, Barger returned to Dr. Dornan for a follow-up, reporting that the anxiety associated with his fibromyalgia cramps made it worse.  (Tr. 1389).  He stated that he had a good initial response to Lyrica, but it was currently ineffective.  *Id.*  Barger also reported symptoms of arthralgias, joint stiffness, and myalgias.  *Id.*  His physical examination results were similar to his December 19, 2019 visit, except with a BMI of 49.34.  (Tr. 1390-91).  Dr. Dornan referred Barger to a chiropractor and aquatherapy.  (Tr. 1391).

On January 23, 2020, Barger visited Kristen LaCrosse, PT, for a physical therapy evaluation.  (Tr. 1217).  Barger reported random whole-body muscle pain and cramping rated at 7/10 and decreased stamina.  (Tr. 1217-19).  He reported that he'd started exercising a few weeks earlier and had done stationary biking, water walking, and kicking in water.  (Tr. 1218).  Barger stated also that he currently exercised by "power lifting" and his hobbies included "motorcycle." *Id.*  On physical examination, Barger had: (i) gluteal atrophy; (ii) 4/5 strength with hip flexion and abduction; (iii) 5/5 strength with knee extension, flexion, and abduction; and (iv) independent gait.  (Tr. 1218-19).  Physical Therapist LaCrosss determined that Barger had a "[g]ood" prognosis with current clinical presentation and recommended physical therapy once a week for 12 weeks.  (Tr. 1217).

On January 24, 2020, Barger attended his second physical therapy session.  (Tr. 1234).  Despite difficulty with back pain, which he rated at 6/10, Barger had "no back pain in water today after ambulation" and he was "very pleased with progress."  (Tr. 1234-35).

10

On February 19, 2020, Barger reported to Dr. Dornan that he was exercising regularly with a bike. (Tr. 1392).  Barger stated that his cramps were still severe, but he got "some" relief from soaking in a hot tub.  *Id.*  He reported symptoms of tiredness and myalgias.  *Id.*  Barger's physical examination results were unremarkable.  (Tr. 1394).  Dr. Dornan noted that Barger's myalgia was stable, attributed to diet, lifestyle changes."  *Id.*

### 2.    Mental Impairments

On May 29, 2013, Barger visited John Zangmeister, MD, reporting feelings of despair, suicidal thoughts, high anxiety, frequent crying, and depression.  (Tr. 534).  He reported difficulty sleeping, concentrating, remembering, and making decisions, as well as irritability. (Tr. 535).  Barger also reported a history of mood swings and occasional depression.  (Tr. 534). Dr. Zangmeister diagnosed depression with anxiety and agitation and prescribed Lexapro.  (Tr. 535).

On June 12, 2013, Barger reported to Dr. Zangmeister "some improvement" with Lexapro, though he still had difficulty concentrating, remembering, and making decisions.  (Tr. 532-33).  Barger asked if he could further improve his anxiety symptoms.  (Tr. 532). Dr. Zangmeister increased the frequency of Barger's Lexapro regimen and encouraged Barger to start counseling.  (Tr. 533).

On August 28, 2013, Barger reported to Dr. Zangmeister that his depression had improved, but since returning to work he was having "significant agitation and labile mood." (Tr. 525).  He also reported difficulty with sleep and restlessness.  (Tr. 526).  Dr. Zangmeister prescribed Seroquel and recommended counseling, noting that Barger's symptoms were seemingly closer to bipolar disorder.  *Id.*

11

On August 7, 2014, Barger visited Wayne Brabender, MD, for psychiatric treatment.  (Tr. 470).  Barger reported that he'd had anger issues for years, with a history of getting into fights, and was told he might have underlying depression and anxiety.  *Id.*  He stated that he stopped taking Seroquel because it wasn't helping, though lorazepam helped at times.  *Id.*  Dr. Brabender referred Barger for a psychiatry consultation.  (Tr. 471).

Between August 7, 2014 and December 24, 2015, Barger continued medication treatment for anxiety but did not return for in-office visits to a treatment provider specifically for his mental health impairments.  *See* (Tr. 454, 456-57, 464).

On December 24, 2015, Barger returned to Dr. Zangmeister, reporting that he'd been let go from his job the month before and had since experienced increased anxiety and depression.  (Tr. 454).  Dr. Zangmeister continued Barger's medication (Depakote), prescribed Xanax for use as needed, and recommended counseling.  (Tr. 456).

Between December 24, 2015 and April 13, 2018, Barger continued to treat his anxiety with Xanax but did not seek treatment specifically for his mental health impairments.  *See* (Tr. 445-53).

On April 13, 2018, Barger visited Alan Shubert, LISW, for a mental health assessment.  (Tr. 1272-73).  Barger reported that he had been diagnosed in 2001 with post-traumatic stress disorder ("PTSD") and anger/aggression disorder, the symptoms of which had recently worsened.  (Tr. 1273).  Barger stated that he was "ready to snap at the drop of a dime and act out violently."  *Id.*  He stated that he experienced these symptoms up to three times per day, which manifested against inanimate objects but not against other people.  *Id.*  Barger also stated that he avoided crowds because he constantly struggled between doing the right thing and the urge to "go off."  *Id.*  Barger further that he rode a motorcycle for leisure and was a member of a

motorcycle club.  (Tr. 1273-74).  In describing his job performance history, Barger stated he "flipped out at work," though he maintained normal attendance and good work performance. (Tr. 1275).  Barger stated that he wanted to address his mental health issues and find work he could "really like."  *Id.*  On mental status examination, Barger had: (i) occasional homicidal ideation; (ii) circumstantial thought process; (iii) anxious mood; and (iv) impaired attention.  (Tr. 1279-80).  Social Worker Shubert recommended outpatient medication treatment.  (Tr. 1282). And between April 20, 2018 and May 4, 2018, Barger visited Social Worker Shubert for counseling.  (Tr. 1286-91).

On April 17, 2018, Barger reported to Dr. Dornan that he was not sleeping and was frequently anxious.  (Tr. 444).  A review of symptoms was also positive for depression and suicidal ideations.  *Id.*  Dr. Dornan diagnosed Barger with mood disorder and prescribed diazepam.  (Tr. 445).  During an April 24, 2018 telephone encounter, Barger reported worsening depression and feeling overwhelmed and upset.  (Tr. 442).  Dr. Dornan prescribed Cymbalta.  *Id.*

On May 15, 2018, Barger reported to Dr. Dornan that his depression was worse with Cymbalta.  (Tr. 440).  Barger was also anxious and had insomnia.  *Id.*  Dr. Dornan replaced Cymbalta with Lexapro.  (Tr. 441).  By May 29, 2018, Barger reported that his mood was "much better" and denied depression and anxiety symptoms.  (Tr. 437-38).  On June 12, 2018, Dr. Dornan noted that Barger continued to do well with Lexapro.  (Tr. 437).

On June 18, 2018, Barger received diagnoses of PTSD, unspecified depressive disorder, intermittent explosive disorder, and unspecified personality disorder from Andrew Hunt, MD. (Tr. 378).

On July 31, 2018, Barger reported to Dr. Dornan that he felt slow and steady improvement in his mood.  (Tr. 433).  A review of symptoms was negative for depression and positive for anxiety.  *Id.*  Dr. Dornan increased Barger's Lexapro dosage.  (Tr. 434).

On November 1, 2018, Barger visited Dr. Hunt for a follow-up.  (Tr. 391).  Barger reported that he was "doing a little bit better."  *Id.*  He reported better mood, that he was less quick to anger, and had some anxiety.  *Id.*  On mental status exam, Barger had unremarkable results.  (Tr. 392).  Dr. Hunt refilled Barger's medication, which included escitalopram and lamotrigine.  *Id.*

On January 3, 2019, Barger reported to Dr. Hunt that he'd had issues with depressive episodes, with thoughts of worthlessness, crying spells, and social isolation.  (Tr. 386).  He also reported anger and irritability.  *Id.*  Barger stated that he'd moved away from his motorcycle club and felt less involved in violence, but he also felt an identity crisis.  *Id.*  Barger's mental status examination results were unremarkable.  (Tr. 390).  Dr. Hunt diagnosed Barger with PTSD, intermittent explosive disorder, and bipolar II disorder.  *Id.*  Dr. Hunt replaced Lexapro with Zoloft to treat Barger's depression and anxiety and prescribed gabapentin.  *Id.*

On February 14, 2019, Barger reported to Dr. Hunt having "pretty decent mood."  (Tr. 381).  Barger reported an incident in which he relived the events of his PTSD but was able to overcome his feelings.  *Id.*  He also stated that he felt overwhelmed by too many people.  *Id.*  On mental status exam he had unremarkable results.  (Tr. 385-86).  Dr. Hunt continued Barger's medication treatment.  (Tr. 386).

On March 25, 2019, Dr. Dornan prescribed Barger Klonopin by telephone for anxiety.  (Tr. 741).  On April 11, 2019, Barger reported to Dr. Hunt that he had a PTSD episode when his son got a tattoo, which he treated with the Klonopin.  (Tr. 1295).  Barger reported "having pretty

decent mood," though he also reported anxiety and crying spells.  *Id.*  On mental status exam, Barger had unremarkable results.  (Tr. 1322-23).  Dr. Hunt continued Barger's medication treatment.  (Tr. 1323).

On June 13, 2019, Barger reported that "things are going okay."  (Tr. 1325).  Barger reported "flashbacks a bit" when watching tattoos on television and sitting in a crowed, but he did not have major outbursts of anger.  *Id.*  On mental status exam, Barger had unremarkable results.  (Tr. 1334).  Dr. Hunt continued Barger's medication treatment.  (Tr. 1335).

On August 5, 2019, Barger reported to Dr. Hunt that he lacked leisure time, as there were "a number of kids around."  (Tr. 1337).  Barger denied major anger outbursts but reported "flashbacks a bit."  *Id.*  He also reported using a cane every day.  *Id.*  On mental status exam, Barger had unremarkable results.  (Tr. 1338).  Dr. Hunt continued Barger's medication treatment.  (Tr. 1338-39).

On October 24, 2019, Barger reported to Dr. Hunt that he attempted suicide by overdose two months before after a bad depressive episode but didn't take enough pills.  (Tr. 1344).  He reported anxiety and panic, though he did not have any major anger outbursts.  *Id.*  Barger also reported that he'd been going to the gym and needed to exercise more.  *Id.*  On mental status exam, Barger had unremarkable results.  (Tr. 1345).  Dr. Hunt refilled Barger's medication and prescribed melatonin to help him sleep.  (Tr. 1345-46).

On November 25, 2019, Barger reported to Dr. Hunt that he felt things were going "pretty well" and stated he'd had no severe depression symptoms.  (Tr. 1350).  Barger's mental status exam results were unremarkable.  (Tr. 1351).  Dr. Hunt continued medication treatment.  (Tr. 1351-52).

On December 30, 2019, Barger reported to Dr. Hunt that he had no major concerns, though he continued to have some depressive symptoms.  (Tr. 1355).  He also reported "flashbacks a bit."  *Id.*  His mental status exam results were unremarkable, and Dr. Hunt continued medication treatment.  (Tr. 1356-57).

On January 30, 2020, Barger reported to Dr. Hunt that he'd had "a few setbacks."  (Tr. 1358).  Barger stated that he punched his friend after the friend called him weak.  *Id.*  Barger also reported that he felt that water therapy was going well.  *Id.*  Barger's mental status exam results were unremarkable.  (Tr. 1359).  Dr. Hunt continued meditation.  (Tr. 1359-60).

On April 6, 2020, Barger reported to Dr. Hunt flashbacks of prison and depression, the symptoms of which at worst kept him in bed and made him irritable.  (Tr. 1361).  Barger reported anxiety following a stay in the hospital for diverticulitis and had to give up water therapy due to COVID-19.  *Id.*  He also reported that he received a BIPAP machine and was sleeping better.  *Id.*  On mental status exam, Barger had unremarkable results.  (Tr. 1362).  Dr. Hunt continued medication, noting that Barger was getting Xanax from Dr. Dornan.  (Tr. 1362-63).

Meanwhile, Barger received individual counseling from different providers from December 30, 2019 through March 5, 2020.  (Tr. 1254-66, 1347-48, 1353).

### C.    Relevant Opinion Evidence

#### 1.    Physical Impairments

##### a.    Treating Source, Kurtis Dornan, MD

On August 5, 2019, Dr. Dornan completed a form medical source statement of Barger's physical capacity.  (Tr. 899-902).  Dr. Dornan opined that as a result of Barger's myalgia, chronic fatigue syndrome, and fibromyalgia, Barger could: (i) sit for up to 10 minutes at a time;

(ii) stand for up to 5 minutes at a time; (iii) sit/stand for less than 2 hours in an 8-hour workday; and (iv) occasionally lift 10 pounds and rarely lift 20 pounds. (Tr. 900-01).

Dr. Dornan further opined that Barger required unscheduled 10-minute breaks every 30 minutes as a result of his muscle weakness, chronic fatigue, and pain. (Tr. 900). Dr. Dornan stated that Barger needed to have his legs elevated at 90° between 50% and 60% of the time as a result of pain and cramping. (Tr. 900-01). Dr. Dornan stated that Barger required the use of an assistive device due to imbalance and pain. (Tr. 901). Dr. Dornan stated that Barger's gross manipulation was limited to 70% of the time, fine manipulation was limited to 80% of the time, front reaching was limited to 20% of the time, and overhead reach was limited to 10% of the time. *Id.* Dr. Dornan stated that Barger would likely be off task at least 25% of the time and would be absent more than four days per month. (Tr. 901-02). Dr. Dornan stated that due to his pain, Barger could not tolerate "low stress" work. (Tr. 901-02). Dr. Dornan also remarked that Barger's ability to work would also be affected by PTSD, which was exacerbated by large groups and closed rooms. (Tr. 902).

**b.      State Agency Consultants**

On April 15, 2019, Anton Freihofner, MD, evaluated Barger's physical capacity based on a review of the medical record, determining that he could perform light work. (Tr. 98-100, 104). Specifically, Dr. Freihofner determined that Barger could: (i) lift 20 pounds occasionally and 10 pounds frequently; (ii) sit/stand/walk 6 hours in an 8-hour workday; (iii) frequently stoop, kneel, crouch, crawl, and climb ramps/stairs; (iv) balance and climb ladders/ropes/scaffolds without limitation; (v) reach over overhead and feel without limitation; and (vi) frequently handle and finger. (Tr. 98-99). On July 25, 2019, Mehr Siddiqui, MD, concurred with Dr. Freihofner's assessment. (Tr. 137-39).

### 2.    Mental Impairments

#### a.    Treating Source, Andrew Hunt, MD

On November 19, 2018, Dr. Hunt completed a questionnaire on Barger's mental impairments.  (Tr. 1268-69).  Dr. Hunt checked boxes indicating that Barger was: (i) seriously limited in his ability to perform at a consistent pace without an unreasonable number and length of rest periods; (ii) unable to meet competitive standards when it came to maintaining attention and concentration, interact appropriately with the general public, or maintain socially appropriate behavior; and (iii)  unable to function when it came to working in coordination and in proximity to others, complete a normal workday/workweek without interruptions, get along with others, or accept instructions and respond appropriately to criticism.  *Id.*  Dr. Hunt opined that Barger would be absent from work twice per week and would be off task 20% of the time because of his impairments.  (Tr. 1269).

#### b.    State Agency Consultants

On April 20, 2019, Aracelis Rivera, PsyD, evaluated Barger's mental capacity based on a review of the medical record.  (Tr. 101-03).  Dr. Rivera determined that Barger had no understanding and memory limitations.  (Tr. 101).  Dr. Rivera opined that Barger had moderate limitations in his ability to maintain attention and concentration, sustain an ordinary routine, and work in coordination with or in proximity with others.  *Id.*  She opined that Barger was moderately limited in his ability to interact appropriately with the public, accept instructions and respond appropriately to criticism, get along with coworkers or peers, and respond appropriately to workplace changes.  (Tr. 102).

Dr. Rivera also opined that Barger would be moderately limited in his ability to complete a normal workday/workweek without interruption, explaining that when compliant with

18

medication and therapy he was able to perform routine tasks in a structured setting without high-paced demands.  (Tr. 101).  She opined that he was moderately limited in his ability to maintain socially appropriate behavior, explaining that he could respond to simple inquiries and interact appropriately with others on a brief, superficial basis.  (Tr. 102).  And she opined that Barger was moderately limited in his ability to set realistic goals, explaining that he had reduced stress tolerance but could adapt and manage himself in a structured and predictable work setting in which changes could be explained.  *Id.*  On August 7, 2019, Mary Hill, PhD, concurred with Dr. Rivera's assessment.  (Tr. 158-60).

### D.     Relevant Testimonial Evidence

Barger testified at the ALJ hearing that he lived with his girlfriend and her daughter.  (Tr. 49).  On a typical good day, Barger stated that he could get up and mow the lawn.  (Tr. 58). Barger stated, however, that he got tired easily and, if he pushed himself too hard, he would be asleep for 12 hours and barely able to bathe or walk afterward.  (Tr. 58, 71).  If he stood over the dishes for too long, Barger stated that his back hurt and he had to sit down.  (Tr. 58).  If he sat for too long, Barger stated that his legs would swell, and he would need to put his feet up.  *Id.*  His physical symptoms caused him to get anxious. *Id.*  And Barger stated that his anxiety caused his muscles to get more tense, exacerbating his physical symptoms.  (Tr. 59, 72-73).  Barger testified that he saw a therapist weekly and a psychiatrist monthly to treat his mental health impairments. (Tr. 60).  He stated that both had been helpful, but it was a "slow process."  *Id.*

Barger testified that he could vacuum because the vacuum was light, and he had carpeting in only two rooms in the house.  (Tr. 61-62).  He could do dishes if there weren't many.  (Tr. 62).  Barger stated that he did not trust himself to cook, but he could make a

sandwich, macaroni and cheese, and grill a burger.  *Id.*  If he took the garbage out or climb stairs, Barger stated that he would have to lie down because of fatigue or soreness and nap.  (Tr. 64).

Barger testified that he could drive and took short trips to the store.  (Tr. 50-51).  Barger testified, however, that climbing in and out of the car hurt.  (Tr. 69).  He stated that sitting for too long in the car also hurt his back.  *Id.*  Barger testified that he could not walk from the parking lot to the store without getting tired and needing to use a motorized cart.  (Tr. 66).  And if he sat for too long, Barger stated that his degenerative disc disease would cause his back to hurt, and his upper thigh would go numb.  (Tr. 67).  Barger stated that sitting was almost as bad as prolonged walking.  *Id.*

Barger testified that his muscle cramps occurred every day, mainly in his legs, especially in the evening.  (Tr. 65).  Barger stated that he did not know what caused his cramps.  (Tr. 66).  He also testified that he elevated his legs mostly at night, which is when it started to bother him.  (Tr. 67-68).  Barger stated he elevated his legs above his heart level, as had been directed by Dr. Dornan.  (Tr. 68).  Barger testified he also had difficulties using his hands, which caused him to involuntarily drop things.  *Id.*

A vocational expert, Michael Klein, testified that an employer would tolerate no more than 10% off-task time and no more than one absence per month.  (Tr. 82).  He testified that elevating one's legs above heart level would constitute off-task behavior.  (Tr. 83).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial

20

evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

(2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of

the evidence supports the claimant's position, the Commissioner's decision still cannot be

overturned "so long as substantial evidence also supports the conclusion reached by the ALJ."

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks

omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or

re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it

is not necessary that this court agree with the Commissioner's findings," so long as it meets this

low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-

guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

　　　Even if substantial evidence supported the ALJ's decision, the court will not uphold that

decision when the Commissioner failed to apply proper legal standards, unless the legal error

was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision .

. . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the

court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d

875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996));

*accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1,

2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or

merely overlooked.").

### B.        Separation of Powers

Barger argues that a remand is required due to the Commissioner's unconstitutional exercise of authority.  ECF Doc. 13 at 8-10.  He argues that the SSA and the Consumer Financial Protection Bureau ("CFPB") have the same structure for the removal of their directors; thus, the Supreme Court's ruling in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020) (hereafter "*Seila Law*") – which found the statute governing the CFPB director's removal violated the principle of separation of powers – applies to the SSA.  ECF Doc. 13 at 8-9. According to Barger, because the ALJ operated under authority delegated to him by the Commissioner, who in turn was unconstitutionally exercising his authority, Barger was "deprived … of a valid administrative process." *Id.*  Barger argues that his application was further harmed as it was made under regulations promulgated by the Commissioner, who lacked the lawful authority to do so.  ECF Doc. 13 at 9.  Barger contends that the separation of powers violation resulted in a "presumptively inaccurate legal standard" being utilized to decide his application. *Id.*

The Commissioner concedes that the statutory removal provisions governing the SSA Commissioner violated the principle of separation of powers but contends that the constitutional error is harmless because the violation did not cause Barger any actual harm.  ECF Doc. 14 at 4-5.  Relying on *Collins v. Yellen*, 141 S. Ct. 1761 (2021), the Commissioner argues that the violation did not harm Barger because the ALJ's appointment was ratified by an acting Commissioner who was not subject to the disputed removal provision and, thus, the removal issue did not void the ALJ's actions.  ECF Doc. 14 at 5-8.  Further, the Commissioner argues that Barger failed to establish a nexus between the removal provision and any harm he suffered; and she asserts, as in *Collins*, the unlawfulness of a removal provision did not strip those appointed

of their authority.  ECF Doc. 14 at 8-11.  Moreover, the Commissioner argues that the separation of powers violation was harmless based on the harmless error doctrine, the *de facto* officer doctrine, the Rule of Necessity, and prudential considerations.  ECF Doc. 14 at 12-16.

Barger replies that the court need not reach the constitutional issue as there are other grounds for remand but contends that he demonstrated an injury from the Commissioner's conduct.  ECF Doc. 15 at 1, 3-5.  Specifically, Barger argues that he was injured from: (i) the Commissioner's changes to HALLEX rules for how decisions were written; (ii) changes to the policies regarding the evaluation of musculoskeletal impairments; and (iii) the deprivation of a constitutionally valid, hearing, adjudication, and decision.  ECF Doc. 15 at 4-6.  He also asserts that because the Commissioner did not contest his standing, he "had standing to raise this issue." ECF Doc. 15 at 4.  Further, he argues that the doctrines the Commissioner cited to support the violation's harmlessness did not apply.  ECF Doc. 15 at 7-9.

In *Collins*, the Supreme Court reviewed the constitutionality of the Federal Housing Financial Agency's removal structure for its directors, which prohibited the president from removing the directors except "for cause." 141 S. Ct. at 1783.  The Court held that the limitation on the president's removal authority over a federal executive branch agency director violated the principle of separation of powers.  *Id.* at 1783.  In doing so, the Supreme Court relied on its prior precedent in *Seila Law*.  *Id.*  In *Seila Law*, the Court held that the CFPB removal structure, which limited the removal of the CFPB Director by the president only to instances of "inefficiency, neglect of duty, or malfeasance of office," violated the separation of powers between Congress and the Executive Branch.  *Id.* at 2197.

Before we address the merits of Barger's constitutional argument, the court has an obligation to ensure it has jurisdiction.  *See Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

Regardless of whether the parties raise or have disclaimed the issue, the court must ensure the parties have standing to raise the issue.  *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019) ("One essential aspect of this [jurisdiction] requirement is that any person invoking the power of a federal court must demonstrate standing to do so" (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)).

The standing requirement enforces the Constitution's limitation that the Judicial Branch may only decide "Cases" and "Controversies."  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-560 (1992).  To demonstrate standing, a plaintiff must show that he has suffered an "injury in fact" that is "fairly traceable" to the defendant's conduct and would likely be "redressed by a favorable decision."  *Id.* at 560-561 (internal alterations removed).

I find that Barger has failed to establish "an injury in fact" arising from the Commissioner's work while he was subject to an allegedly unconstitutional removal statute.  An "injury in fact" must be more than an abstract asserted harm and must be an "invasion of a legally protected interest" that is: (i) concrete; (ii) particularized; and (iii) actual or imminent.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).  Barger initially asserts only that the alleged separation of powers issue contaminated the administrative process by which a decision was reached on his claim and that a "presumptively inaccurate" legal standard was used.  However, he cites no authority for his presumption.  In his reply, Barger attempts to bolster his asserted injury by contending that the Commissioner's policy changes on how ALJ decisions were written and the modification of the musculoskeletal listing of impairments harmed him.  But Barger's contentions fail in one significant way – he has never argued that these issues affected the decision on *his* claim.  Barger bases his argument that he was deprived of a valid administrative process on the separation of powers issue.  *See* ECF Doc.

14 at 8.  He never demonstrated that *because* of the separation of powers violation the ALJ in his case applied a legal standard the president might have disagreed with, or that a different Commissioner might have altered.  And Barger's other claimed harms are similarly flawed.  He has made no argument that the changes in the musculoskeletal listing somehow adversely affected his ability to prove his disability or that the changes in how ALJ decisions were written created a due process issue.

Absent some argument demonstrating a personal connection between those changes and the decision on his claim, Barger asks this court to base its jurisdiction on a generalized grievance.  And this has long been insufficient to constitute a "Case" or "Controversy."  *See Lujan*, 504 U.S. at 560 n.1 (holding that for an injury to be "particularized" the complained of conduct must have affected the plaintiff "in a personal and individual way"); *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (holding that harm which affected the plaintiff and every citizen's interest in the proper application of the constitution and laws, and relief that did not tangibly benefit him more than other citizens was not a case or controversy).

Because Barger has not alleged a particularized injury stemming from the asserted separation of powers violation, he has failed to meet his burden of establishing standing.  *Va. House of Delegates*, 139 S. Ct. at 1950.  And we should not, therefore, consider the merits of his constitutional challenge to the SSA.  I recommend that challenge be rejected.

**C.  Step Three: Listings 12.04, 12.08, 12.15**

Barger argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence in his evaluation of Listings 12.04, 12.08, and 12.15.  ECF Doc. 13 at 12-13.  Barger argues that the ALJ inaccurately represented the extent of his limitations when the ALJ found that Barger could cook and get along with others because he

lived with his girlfriend and others.  ECF Doc. 13 at 13.  He argues that the ALJ failed to discuss his physical aggression, verbal aggression, and explosive temper.  ECF Doc. 13 at 14.  He argues that the ALJ instead relied on evidence not relevant to his degree of functioning since the alleged onset date, and the evidence the ALJ cited supported a finding of marked limitations in the areas of functioning in which the ALJ determined he had only moderate limitations.  ECF Doc. 13 at 14-15.

The Commissioner disagrees, arguing that the ALJ reasonably determined that Barger's mental health symptoms did not cause more than moderate limitations under the paragraph B criteria.  ECF Doc. 14 at 16-18.

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").  In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful review."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).

Listings 12.04, 12.08, and 12.15 establish the automatic-disability criteria for depression, bipolar and related disorders, personality and impulse-control disorders, and trauma- and

stressor-related disorders, respectively.  20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.04, 12.08, 12.15.  To meet the Listings for 12.04, 12.08, and 12.15, the claimant must show that he meets the functional limitations criteria in paragraph B.[4]  *Id.* §§ 12.00A, 12.04, 12.08, 12.15.  To meet paragraph B, the claimant must show that a mental health condition resulted in an extreme limitation on one, or marked limitations in two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; and (4) adapt or manage oneself.  *Id.* §§ 12.04B, 1208B, 12.15B.

The severity of a limitation is measured on a five-point scale that evaluates the claimant's ability to function in one of the above areas independently, appropriately, effectively, and on a sustained basis.  *Id.* § 12.00F2.  The five rating points are: (1) no limitation; (2) mild limitation (slightly limited functioning); (3) moderate limitation (fair functioning); (4) marked limitation (seriously limited functioning); and (5) extreme limitation (no ability to function).  *Id.*  The existence of only moderate or mild limitations will not meet the paragraph B standard.

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in concluding that Barger's mental impairments did not meet or equal Listings 12.04, 12.08, and 12.15.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  In analyzing each of the areas of mental functioning, the ALJ reasoned:

> In interacting with others, [B]arger has a moderate limitation.  [Barger] reported difficulty getting along with others, anger, and outbursts.  (17F, 4-14).  He explained that he had a hard time being at family functions and being around crowds and others.  (10E).  At times, [Barger] was noted to have a labile affect.  (3F, 37-38, 44-45).  In January 2020, [Barger] reported having a physical altercation with a friend.  (18F, 67).  However, other treatment records noted good eye contact, being very pleasant, and cooperative behavior.  (5F, 8-13; 17F, 4-14; 18, 34-44, 46-48, 53-55, 59-61, 64-72).  He testified that he lived with others,

---

[4] A claimant could alternatively meet Listings 12.04 and 12.15 by satisfying the criteria in paragraph C, but Barger does not contest the ALJ's Paragraph C finding, so it is forfeited.  20 C.F.R. pt. 404, Subpt. P., App. 1 §§ 12.00A2, 12.04, 12.15; *Walp v. Saul*, No. 4:18cv897, 2019 U.S. Dist. LEXIS 137407, at *8 n.4 (N.D. Ohio August 14, 2019); *see generally* ECF Doc. 13; ECF Doc. 15.

> including his girlfriend and her daughter.  Therefore, the evidence supports a finding that [Barger] has no more than a moderate limitation in this area.
>
> With regard to concentrating, persisting or maintaining pace, [Barger] has a moderate limitation.  [Barger] reported difficulty with completing task[s] and concentration.  (10E).  At times, [Barger's] attention was found to be impaired.  (17F, 4-14).  However, in other records, he was noted to be engaged.  (18F, 34-44, 46-48, 53-55, 59-61, 64-72).  [Barger] testified that he could prepare simple meals, perform some chores as physical[y] able, and drive short distances.  [Barger] reported being able to count change.  Therefore, the evidence supports a finding that [Barger] has no more than a moderate limitation in this area.
>
> As for adapting or managing oneself, [Barger] has experienced moderate limitation.  [Barger] testified that he experienced anxiety and he reported difficulty with handling stress and changes in routine, anger, and outbursts.  (10E; 17F, 4-14).  At times, [Barger] had a depressed and/or anxious mood, a labile affect, and occasional homicidal thoughts when angry.  (5F, 8-13; 10F, 32-40; 17F, 4-14; 18F, 62).  However, at other times, [Barger] was found to have appropriate grooming or well groomed, being very pleasant, oriented, a full in range, normal or broad affect, normal mood, cooperative behavior, an appropriate overall appearance, generally relaxed and engaged behavior and manner, calm motor activity, and appropriate insight and judgment.  (3F, 37-38; 5F, 8-13; 7F, 2-23; 10F, 32-40; 17F, 4-14; 18F, 34-44, 46-48, 53-55, 59-61, 64-72).  therefore, the evidence supports a finding that [Barger] has no more than a moderate limitation in this area.

(Tr. 20-21).  The ALJ's analysis of the paragraph B criteria complied with the regulations by actually evaluating the evidence, comparing the limitations supported by that evidence with areas of mental functioning listed in paragraph B, and explaining the basis for his findings.  *Reynolds*, 424 F. App'x at 416.

Contrary to Barger's argument, the ALJ did not mischaracterize the extent of his ability to cook.  The ALJ did not say he could cook without limitation, but merely that he could "prepare simple meals," which was consistent with Barger's testimony that he could make a sandwich, prepare macaroni and cheese, and grill a burger.  (Tr. 62).  And the ALJ did not, as Barger claims, err by not discussing evidence of his aggression and temper, namely, Barger's statements to Social Worker Shubert.  ECF Doc. 13 at 14 (citing Tr. 1276).  The ALJ did so

expressly and as part of the same analysis in which he considered Barger's living situation.  (Tr. 20 (citing Tr. 1273-83)).  Further, the ALJ expressly mentioned Barger's physical altercation with a friend, which Barger conveyed to Dr. Hunt in reference to his impulse disorder.  (Tr. 20 (citing Tr. 1358)).

Barger's other arguments are likewise unavailing.  Barger argues that a remand is warranted under *Lorman* because the ALJ relied solely on his ability to perform activities of daily living to conclude that he wasn't disabled.  ECF Doc. 13 at 14 (citing *Lorman v. Comm'r of Soc. Sec.*, 107 F. Supp.3d 829 (S.D. Ohio 2015)).  But *Lorman*'s holding – that the ability to perform some activities on a limited basis is not substantial evidence that a claimant's symptoms were not disabling – was made in reference to the ALJ's *Step Four* findings.  107 F. Supp.3d at 838.  As will be discussed more fully below, the ALJ didn't rely solely on Barger's activities of daily living to conclude that he wasn't disabled at Step Four.  The ALJ similarly did not rely solely on Barger's activities of daily living at Step Three; rather, the ALJ considered Barger's own statements regarding his functional limitations, objective exam findings from treatment providers, and his activities of daily living.  *See* (Tr. 20-21).  And the ALJ found persuasive the opinion of the state agency consultants, who opined that Barger had only moderate limitations.  (Tr. 32-33); *see* (Tr 96, 100-01, 135, 140-42).

Barger also argues that a remand is warranted because the evidence the ALJ cited was not relevant to his degree of mental functioning.  ECF Doc. 13 at 14 (citing *Elliott v. Comm'r of Soc. Sec.*, No. 1:20-CV-00545, 2021 U.S. Dist. LEXIS 129165 (N.D. Ohio June 29, 2021)).  But other than charging the ALJ with relying on irrelevant evidence, Barger has not explained why the evidence the ALJ relied on wasn't relevant to the paragraph B areas of mental functioning.  *See*

ECF Doc. 13 at 13-14.  Barger's relevancy argument, thus, fails to establish a basis for remand. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

The thrust of Barger's argument is that his mental health impairments warranted greater limitations than what the ALJ found.  But disagreement with how the ALJ weighed the evidence is not cause for remand.  *Jones*, 336 F.3d at 476.  The reasons the ALJ gave and the evidence the ALJ relied on were adequate and sufficient to support his conclusions, such that his paragraph B findings fell within his "zone of choice" and cannot, therefore, be second-guessed by this court. *Mullen*, 800 F.2d at 545.

### D.    Step Three: Listings 1.02 and 1.04

Barger also argues that the ALJ failed to apply proper legal standards in his evaluation of Listings 1.02 and 1.04 because the ALJ did not consider them in combination with his obesity and fibromyalgia.  ECF Doc. 13 at 15.  Barger argues the ALJ failed to properly consider Barger's obesity, fibromyalgia, and chronic fatigue as required by SSR 19-2p, SSR 12-2p, and SSR 14-1p.  ECF Doc. 13 at 15-18.  And Barger argues that the ALJ's analysis of the Listings was too perfunctory to allow for meaningful review.  ECF Doc. 13 at 17-18.

The Commissioner responds that the ALJ's consideration of Barger's obesity was adequate, given the lack of evidence documenting associated limitations.  ECF Doc. 14 at 18-19. The Commissioner further argues that the ALJ reasonably applied SSR 12-2p to determine that Barger did not meet or equal Listing 14.09 on account of his fibromyalgia.  ECF Doc. 14 at 19-20.  The Commissioner argues Barger has not shown what error the ALJ committed in his application of SSR 12-2p or SSR 14-1p.  ECF Doc. 14 at 20.

In his reply brief, Barger argues that the ALJ's error was his failure to adequately explain how he evaluated Barger's fibromyalgia pursuant to SSR 12-2p.  ECF Doc. 15 at 1.

### 1.    Listings 1.02 and 1.04

The ALJ applied proper legal standards in his evaluation of Listing 1.02 and arguably failed to do so in his evaluation of Listing 1.04.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  In his Step Three analysis, the ALJ stated that he considered whether Barger's arthritis met or medically equaled Listings 1.02 and 1.04, stating in both cases that the evidence discussed at later steps in the sequential analysis did not establish that he satisfied the Listings' criteria.  ECF Doc. 11 at 18-19.  For Listing 1.02, the ALJ narrowed his recitation of the Listing criteria to Listing 1.02B.  (Tr. 18-19)  To meet the requirements of Listing 1.02B, Barger would have had to present evidence establishing a major dysfunction of a joint:

> Characterized by gross anatomical deformity … and chronic joint pain and stiffness and with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> ***
>
> B. Involvement of one major peripheral joint in each upper extremity … resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.02 (2019).  Although the ALJ didn't specify at Step Three the basis for his conclusion that Barger didn't satisfy the requirements of Listing 1.02B, he didn't need to constrain his analysis into a single neat and tidy paragraph.  *Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010).  We read the ALJ's decision as a whole and with commonsense, and we can look to the ALJ's other findings to support his conclusions at Step Three.  *Id.*; *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365-66 (6th Cir. 2014).  Doing so, we can infer that the basis for the ALJ's finding that Barger did not meet Listing 1.02B was that the evidence did not establish an inability to perform fine and gross

movements effectively – *i.e.*, that he was "capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00B2c (2019).  The evidence discussed elsewhere in the ALJ's decision would support the ALJ's conclusion in that regard, including: (i) negative Tinel's and Finkelstein tests; (ii) intact sensation to fine touch and normal sensation; (iii) no instability in the upper extremity joints; (iv) normal range of motion; and (v) Barger's testimony that he was able to prepare simple meals, perform some chores, and drive short distances.  (Tr. 20-21, 30); *see* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.00B2c (2019) (listing as examples of inability to perform fine and gross movements effectively as inability to prepare simple meals, feed oneself, take care of personal hygiene, sort and handle papers or files, and place files in a file cabinet at or above waist level).

The ALJ's findings with regard to Listing 1.04 are less clear.  Listing 1.04 requires a disorder of the spine resulting in compromise of a nerve root or the spinal cord, with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

32

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04 (2019).  The ALJ didn't specify which of these criteria Barger failed to meet or on what basis.  This, given the multiple sets of criteria, frustrates our ability to meaningfully review the ALJ's decision.  *Reynolds*, 424 F. App'x at 414, 416; (Tr. 19).

An articulation error at Step Three, however, can be harmless if the claimant did not put forth sufficient evidence to demonstrate that he meets the listing criteria.  *Forrest*, 591 F. App'x at 366.  Barger has not pointed to evidence of spinal arachnoiditis and lumbar stenosis that results in pseudoclaudication, both of which are diagnostic prerequisites for Listing 1.04B and 1.04C.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04B-C (2019); *Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 530 (6th Cir. 2006); *Works v. Colvin*, No. 13-2570, 2014 U.S. Dist. LEXIS 108084, at *20 n.4 (E.D. Mich. June 18, 2014); *see generally* ECF Doc. 13; ECF Doc. 15; (Tr. 733, 752, 954-55).  Barger also has not pointed to evidence of sensory or reflex loss as a result of a nerve root compression, nor has he pointed to positive straight leg raise test results.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04A (2019).

Because the ALJ applied proper legal standards in his evaluation of Listing 1.02 and because Barger failed to adduce sufficient evidence to demonstrate that he met the criteria for Listing 1.04 – thereby rendering harmless the ALJ's articulation error regarding his discussion of that Listing – I find no basis for remand on account of the ALJ's analysis of Listings 1.02 and 1.04.  *See Forrest*, 591 F. App'x at 366; *see also*, *e.g.*, *Faulkner v. Comm'r of Soc. Sec.*, No. 2:20-cv-5136, 2021 U.S. Dist. LEXIS 197826, at *14 (S.D. Ohio Oct. 14, 2021); *Walden v. Comm'r of Soc. Sec.*, No. 1:19-cv-00288, 2021 U.S. Dist. LEXIS 18100, at *21-25 (E.D. Tenn. Feb. 1, 2021); *Clanton v. Comm'r of Soc. Sec.*, No. 1:14-CV-1039, 2016 U.S. Dist. LEXIS 921, at *13 (W.D. Mich. Jan. 6, 2016).

2.    **Obesity**

At Step Three, the regulations don't call for a "particular mode of analysis" when it comes to obesity.  *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006) (discussing SSR 19-2p's predecessor, SSR 02-1p); SSR 19-2p, 2019 SSR LEXIS 2, at *11-12 (May 20, 2019).  The regulations provide only that the functional limitations caused by obesity may, alone or in combination with another impairment, medically equal a listing.  SSR 19-2p, 2019 SSR LEXIS 2, at *11.

The ALJ applied proper legal standards in his evaluation of Barger's obesity at Step Three.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ expressly considered Barger's obesity at Step Three but found that "there is no evidence that [Barger's] obesity alone, or in combination with another impairment, meets or medically equals a listing."  (Tr. 20).  That was sufficient consideration to comply with the regulations.  *Cf. Austin v. Comm'r of Soc. Sec.*, 714 F. App'x 569, 574 (6th Cir. 2018).  Moreover, Barger has not identified on what basis he believes his obesity warrants a finding that he met or medically equaled Listing 1.02 or Listing 1.04.  *See, e.g.*, *Schunn v. Comm'r of Soc. Sec.*, No. 1:20-CV-01779, 2021 U.S. Dist. LEXIS 236574, at *30 (N.D. Ohio Nov. 10, 2021); *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-01849, 2021 U.S. Dist. LEXIS 208622, at *21-22 (N.D. Ohio Oct. 6, 2021).  This failure dooms the claim.  *McPherson*, 125 F.3d at 995-96.

To the extent Barger challenges the ALJ's consideration of his obesity in making the ALJ's RFC determination, SSR 19-2p requires the ALJ to consider the limiting effects of obesity in his RFC.  And the regulation requires an explanation: "As with any other impairment, we will explain how we reached our conclusion on whether obesity causes any limitations."  SSR 19-2p, 2019 SSR LEXIS 2, at *12-13.  The ALJ expressly did so, explaining that he considered

Barger's obesity's effects in assessing Barger's RFC.  (Tr. 20).  And at Step Four, the ALJ expressly discussed Barger's obesity in his analysis of Barger's subjective symptom complaints and stated that his RFC findings included limitations stemming from consideration of Barger's obesity.  (Tr. 27, 31).

The ALJ could have said more than he did about why Barger's obesity did not meet a Listing when it was considered in combination with other impairments, "but this court's role is not to ensure that everything that can be said on a topic gets said in an ALJ decision; it is to ensure that what is said is supported by substantial evidence."  *Miley v. Comm'r of Soc. Sec.*, No. 1:20-cv-2550, 2021 U.S. Dist. LEXIS 244271, at *29 (N.D. Ohio Dec. 22, 2021).  Contrary to what Barger's argument implies, "the regulations do not require the ALJ to prove a negative."  *Id.* at *30.  And other than faulting the ALJ for not more fully discussing the relationship between his obesity and other impairments, Barger has not met his "burden of showing specifically how [his] obesity, in combination with other impairments, limited [his] ability to a degree inconsistent with the ALJ's RFC."  *Lumpkin*, No. 1:20-CV-01849, 2021 U.S. Dist. LEXIS 208622, at *21 (quotation marks omitted); *see also Schunn*, No. 1:20-CV-01779, 2021 U.S. Dist. LEXIS 236574, at *31; *Ashley v. Comm'r of Soc. Sec.*, No. 17-11821, 2018 U.S. Dist. LEXIS 164357, at *23 (E.D. Mich. Aug. 23, 2018).  Therefore, I find no error in the ALJ's consideration of Barger's obesity.

### 3.    Fibromyalgia and Chronic Fatigue

Neither fibromyalgia nor chronic fatigue syndrome are listed impairments.  SSR 12-2p, 2012 SSR LEXIS 1, at *17 (July 25, 2012); SSR 14-1p, 2014 SSR LEXIS 1, at *24-25 (Apr. 3, 2014).  The regulations require instead that an ALJ determine whether these impairments, singly

or in combination with others, medically equal a listed impairment.  SSR 12-2p, 2012 SSR LEXIS 1, at *17; SSR 14-1p, 2014 SSR LEXIS 1, at *25.

Barger has not established a basis for remand on account of the ALJ's evaluation of his fibromyalgia and chronic fatigue syndrome at Step Three.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Although Barger contends the ALJ failed to consider Listing 1.02 and 1.04 in light of his fibromyalgia, Barger has not argued on what basis he believes that his fibromyalgia satisfies the criteria for either Listing.  *See generally* ECF Doc. 13; *McPherson*, 125 F.3d at 995-96.  Rather, Barger contends the ALJ should have found greater functional limitations as a result of his fibromyalgia and chronic fatigue syndrome, which instead relates to the ALJ's consideration of these impairments at Step Four.  *See* ECF Doc. 13 at 15-16.  This reading of Barger's brief is supported by his argument that a remand is warranted under *Bright*, in which the court commented on the ALJ's handling of the claimant's fibromyalgia at Step Four.  ECF Doc. 13 at 16-17 (citing *Bright v. Comm'r of Soc. Sec.*, No. 3:19-CV-02371, 2021 U.S. Dist. LEXIS 61880 (N.D. Ohio Mar. 31, 2021)).  As will be discussed below, the ALJ applied proper legal standards and reached a decision supported by substantial evidence at Step Four.  For purposes of Step Three, however, I find that Barger has not established a basis for remand on account of the ALJ's application of SSR 12-2p and SSR 14-1p.  *See Jones v. Comm'r of Soc. Sec.*, No. 2:18-cv-00455, 2019 U.S. Dist. LEXIS 127699, at *43-44 (S.D. Ohio July 31, 2019).

### E.    Step Four: Weighing Opinion Evidence

Barger argues that the ALJ failed to apply proper legal standards in explaining his reasons for finding Dr. Dornan's and Dr. Hunt's opinions unpersuasive.  ECF Doc. 13 at 21-23.  Barger argues that the ALJ's rationale for rejecting Dr. Hunt's opinion was not coherent because the state agency consultants opined that he would have "limitations with his ability to sustain an

ordinary routine without special supervision," and unlike the state agency consultants, Dr. Hunt had a treating relationship with Barger.  ECF Doc. 13 at 21.  Barger argues that the ALJ failed to provide a coherent explanation for discounting Dr. Dornan's opinion because Dr. Dornan's treatment notes from around the time of his opinion corroborated his findings.  ECF Doc. 13 at 21-22.  Barger also argues that the ALJ erroneously discounted the doctors' opinions because they were based on his subjective symptom complaints.  ECF Doc. 13 at 22-23.

The Commissioner disagrees, arguing that the ALJ reasonably determined that Dr. Dornan's and Dr. Hunt's opinions were unsupported and inconsistent with other evidence. ECF Doc. 14 at 23-25.  Barger's reply brief largely reiterates his initial argument.  ECF Doc. 15 at 2-3.

At Step Four, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e).  In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[5].  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more

---

[5] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R.

§ 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards in his evaluation of Dr. Dornan's and Dr. Hunt's

opinions.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ found Dr. Dornan's opinion

unpersuasive because:

> It is not supported by clinical findings that include no joint deformities,
> rheumatoid nodules, clinical synovitis, or knee effusions, full lumbar flexion was
> full, no percussion tenderness to the thoracic or lumbar spine, no instability to any
> upper or lower extremity joints, negative Tinel's and Finkelstein tests, intact
> sensation to fine touch to normal sensation, a normal toe and heel walk, normal
> musculoskeletal range of motion with normal strength, no tenderness, swelling, or
> deformity, a normal gait, normal motor function, lungs clear to auscultation,
> normal pulmonary effort, normal breath sounds, no respiratory distress, clear
> bilateral breath sounds, no decreased breath sounds, and no acute distress.  (5F, 8-
> 13; 8F, 6-9; 10F, 32-40; 12F, 202-06; 13F, 5-7, 13-15; 14F, 5-6; 19F).  Further,
> when looking at Dr. Dornan['s] treatment notes from August 16, 2019 close in
> time to when the opinion was given, his examination findings included
> generalized tenderness to the upper and lower extremities bilaterally and morbid
> obesity, but also normal neck range of motion, not acute distress, and no lower
> extremity edema.  (13F, 13-15).  With respect to Dr. Dornan['s] mental
> limitations, he found that [Barger] had a labile affect at times, but more
> consistently [Barger] was noted to have a normal mood and affect or normal
> behavior.  (3F, 37-38, 41-42, 44-45; 5F, 15-16; 13F, 5-7; 19F).  The opinion is
> somewhat consistent with the testimony of [Barger], but the opinion is not
> consistent with the opinions of the State Agency physicians.

(Tr. 32).  The ALJ's analysis of Dr. Dornan's opinion of Barger's physical limitations[6] complied

with the regulations.  The ALJ explained that he found Dr. Dornan's opinion of Barger's

physical limitations unsupported by his own clinical findings, but also to be inconsistent with the

objective findings of other treatment providers, of whom he cited Dr. Tsai's, Nurse Practitioner

Uchenna's, and Basem Haddad's, MD (whom Barger visited for sleep apnea) treatment notes

---

[6] Dr. Dornan did not ascribe any functional limitations to Barger's mental health impairments, other than
to note that his physical impairments were exacerbated by his mental limitations.

and the opinion of the state agency consultants[7].  20 C.F.R. § 404.1520c(c)(2); (Tr. 32); *see also*
(Tr. 735-39, 878-86, 1104-08).  The ALJ stated that he found Dr. Dornan's opinion of Barger's
physical limitations unsupported by Barger's own objective exam findings around the time of the
opinion of normal neck range of motion, Barger's demeanor, and no lower extremity edema.  20
C.F.R. § 404.1520c(c)(1); (Tr. 13); *see* (Tr. 1209-11).  And the ALJ cited unremarkable
objective exam findings in Dr. Dornan's other treatment notes.  (Tr. 32 (citing Tr. 835-38, 1201-
03, 1209-11, 1377-94)).

Barger challenges the ALJ's analysis of Dr. Dornan's opinion on the basis that
Dr. Dornan's opinion was consistent with his own testimony, Dr. Dornan's treatment notes
around the time of the opinion repeatedly documented his symptoms, and Dr. Dornan's treatment
notes contained objective exam findings of generalized tenderness.  The ALJ acknowledged that
Dr. Dornan's opinion was consistent with Barger's testimony and partially corroborated by
Dr. Dornan's treatment notes.  (Tr. 32).  Those observations didn't undermine the ALJ's ultimate
conclusion, given that the ALJ said so in the context of contrasting Barger's testimony and
Dr. Dornan's corroborative treatment notes with Dr. Dornan's other observations, the objective
findings of other providers, and the other opinion evidence.  *See id.*  Those were conflicts in the
evidence that the ALJ was required to resolve in determining whether the opinions were
persuasive.  Our role isn't to reweigh the evidence to see whether the weight of the evidence
might also support a different conclusion; rather, we must determine whether there was enough

---

[7] Arguably, the ALJ conflated the supportability and consistency evaluations when he cited other
clinicians' findings as not "supporting" Dornan's own conclusions.  That would be more of a
"consistency" evaluation.  But the court could readily understand that the ALJ was stating that
Dr. Dornan's opinions did not find support in his own clinical records or in the clinical records of other
medical providers who treated Barger.

evidence supporting the ALJ's conclusion that a reasonable mind might as accept as sufficient.

Here, there is no doubt that there was.  *See Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

As for Dr. Hunt, the ALJ found his opinion of Barger's mental limitations unpersuasive

because:

> The opinions are not supported by mental status examination findings that include appropriate grooming or well groomed, being very pleasant, oriented, a full in range, normal, or broad affect, normal mood, cooperative behavior, and appropriate overall appearance, generally relaxed and engaged behavior and manner, calm motor activity, good eye contact, a neutral, happy reported mood, unremarkable thought content and process, orientation to person, place, time, and situation, appropriate insight and judgment, grossly intact memory, and average intellect.  (3F, 37-38; 5F, 8-13; 7F, 2-23; 10F, 32-40; 17F, 4-14; 18F, 34-44, 46-48, 53-55, 59-61, 64-72; 19F)  These opinions are not consistent with the opinions of the State Agency physicians, but are somewhat consistent with the testimony and reports of [Barger].  (10E)

(Tr. 33).  The ALJ's discussion found that Dr. Hunt's opinion was not supported by his

examination findings regarding Barger's mental status, grooming, demeanor, affect, mood,

behavior, insight, judgment, memory, intellect, overall appearance and orientation to person

place and time.  20 C.F.R. § 404.1520c(c)(1); (Tr. 33 (citing Tr. 805-26, 1325-35, 1337-39,

1344-46, 1350-52, 1355-63))  And the ALJ found Dr. Hunt's opinions to be inconsistent with the

opinion of the state agency consultants and the unremarkable mental exam findings of other

providers, including Dr. Tsai, Dr. Dornan, and Social Worker Shubert.  20 C.F.R.

§ 404.1520c(c)(2); (Tr. 33 (citing Tr. 433-34, 735-40, 878-86, 1273-83, 1377-94).

Barger appears to argue that the ALJ's analysis was flawed because the ALJ didn't

explain how the state agency consultants' opinion was inconsistent with Dr. Hunt's when they,

like Dr. Hunt, found limitations in Barger's ability to sustain an ordinary routine.  ECF Doc. 13

at 21.  But the state agency consultants explained that Barger's limitations could be

accommodated by working in a structured setting without high-paced production demands under

ordinary levels of supervision, which the ALJ incorporated in functional limitations in his RFC which restricted Barger to work "with no strict production rate pace requirements with only occasional interaction with supervisors … and only routine workplace changes." (Tr. 22, 32-33, 101, 119-20, 141, 159). And although Barger notes that Dr. Hunt had a treating relationship with Barger, the most important factors the regulations recognize are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ analyzed the supportability and consistency of the opinion evidence and sufficiently explained his reasoning in doing so. Barger may disagree with the ALJ's ultimate conclusion; but, as stated above, our role isn't to reweigh the evidence. The ALJ properly analyzed the opinion as required by the regulations, and cited evidence that reasonably supported his conclusion. *See Bass*, 499 F.3d at 509.

With regard to both opinions, Barger also argues that the ALJ was wrong to discount because they were based on Barger's subjective complaints. ECF Doc. 13 at 22-23. That contention is belied by the ALJ's decision, the relevant portions of which are quoted above, which shows that the ALJ found the opinions unpersuasive for reasons other than reliance upon subjective complaints. (Tr. 32-33).

Because the ALJ complied with the regulations in how he weighed the opinions of Dr. Dornan and Dr. Hunt and because his conclusion were supported by substantial evidence, the ALJ's finding that their opinions were unpersuasive fell within the Commissioner's "zone of choice" and must, therefore, be affirmed. *Biestek*, 139 S. Ct. at 1154; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241; 42 U.S.C. § 405(g).

### F.     Step Four: RFC

Barger argues that the ALJ failed to apply proper legal standards in making his RFC determination. ECF Doc. 13 at 23-25. Barger argues the ALJ failed to articulate his reasons for

discounting Barger's subjective symptom complaints beyond a "boilerplate paragraph." ECF Doc. 13 at 23.  Barger argues the ALJ ignored evidence that corroborated Barger's testimony. ECF Doc. 13 at 19.  And Barger argues that the ALJ failed to consider the residual effects of Barger's fibromyalgia pain and either how it impacted his ability to sustain attention and concentration or how it exacerbated his chronic fatigue.  ECF Doc. 13 at 19.

The Commissioner responds that the ALJ adequately explained his reasons for discounting Barger's subjective symptoms complaints, including those related to his fibromyalgia.  ECF Doc. 14 at 20-23.  Barger's reply brief argues that the ALJ failed to adequately explain how he evaluated his fibromyalgia and chronic fatigue syndrome.  ECF Doc. 15 at 1-2.  And he specifically argues that the ALJ failed to "take into account the records which documented Plaintiff's problems when the symptoms were active."  ECF Doc. 15 at 2.

As stated above, at Step Four of the sequential process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5, at *14.  And in the case of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, 2012 SSR LEXIS 1, at *17.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v.*

*Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  This is more difficult in the case of fibromyalgia, which is characterized by the lack of "objectively alarming signs."  *Rogers*, 486 F.3d at 243; *see Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the alleged severity of the impairment almost never exists).  Nevertheless, as with other impairments, the lack of corroborating medical evidence is not on its own dispositive of the severity of a claimant's impairments.  SSR 12-2p, 2012 SSR LEXIS 1, at *14; SSR 16-3p, 2016 SSR LEXIS 4, at *12-13.  In such cases, the ALJ must:

> consider all of the evidence in the record, including the person's daily activities, medications, or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.

SSR 12-2p, 2012 SSR LEXIS 1, at *14; *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *18-19.  The same is true with respect to chronic fatigue syndrome.  SSR 14-1p, 2014 SSR LEXIS 1, at *20.

However, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4, at *15; *see* SSR 12-2p, 2012 SSR LEXIS 1, at *13 (stating that subjective symptom complaints of fibromyalgia symptoms are evaluated under the two-step framework in SSR 96-7p, SSR 16-3p's predecessor); SSR 14-1p, 2014 SSR LEXIS 1, at *26 n.43 (cross-referencing SSR 96-7p).  If the ALJ discounts or rejects the claimant's subjective symptom complains, he must state clearly his reasons for doing so with sufficient detail to permit meaningful review.  SSR 16-3p, 2016 SSR LEXIS 4, at *26.

### 1.      Physical Impairments

The ALJ applied proper legal standards – including SSR 12-2p and SSR 14-1p – and reached a conclusion supported by substantial evidence in evaluating Barger's subjective symptoms complaints of his physical impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ complied with the regulations by: (i) expressly considering all of Barger's symptoms, other evidence, and Barger's statements regarding his symptoms; and (ii) clearly explaining that he rejected Barger's subjective symptom complaints because his statements regarding the intensity, persistence, and limiting effects of his symptoms were not consistent with the objective evidence.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at *9-10; (Tr. 22-23).

Contrary to Barger's argument, the ALJ's explanation for rejecting Barger's subjective symptom complaints wasn't limited to a boilerplate finding that his symptoms were inconsistent with the evidence.  ECF Doc. 13 at 23.  The ALJ expounded upon the boilerplate with two lengthy paragraphs contrasting evidence that the ALJ believed corroborated Barger's impairments with evidence that the ALJ believed was inconsistent with the degree of severity Barger alleged.  (Tr. 29-30).  Admittedly, the ALJ did so in a way that didn't tie the subjective symptoms to the evidence with which the ALJ determined it was inconsistent.  But reading the decision as a whole and with common sense, we can infer the ALJ's reasoning.  *See Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79.

The ALJ acknowledged Barger's fibromyalgia and chronic fatigue symptoms – fatigue, muscle cramps, pain with prolonged walking and sitting, leg edema and the need to elevate his legs, and difficulty with dropping things.  (Tr. 22).  And the ALJ cited evidence that was inconsistent with the severity of Barger's alleged symptoms, such as: (i) Barger's statements to treatment providers between August 2018 and October 2019 that his cramps were improving

44

with treatment; (ii) Barger's statements that his pain was responding well to marijuana treatment; (iii) Barger's statements to providers between October 2019 and February 2020 that he was going to the gym and doing aquatherapy; and (iv) Dr. Dornan's statement in his February 2020 treatment that Barger's myalgia was stable.  (Tr. 30); *see also* (Tr. 401, 403, 430, 805, 835, 878, 882, 1104, 1325, 1344, 1350, 1358, 1377, 1392).  Although the ALJ didn't expressly mention SSR 12-2p and SSR 14-1p, his analysis was nevertheless consistent with what those rulings require.  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 834 (6th Cir. 2006) ("Because the ALJ conducted the analysis required by the Ruling, his failure to mention it by name is not fatal to the decision.").  That isn't to say the ALJ's decision was perfect.  The ALJ also cited a laundry list of unremarkable imaging test results and physical exam findings.  (Tr. 35).  Although not wholly irrelevant, the lack of objective exam findings is of limited value in assessing a claimant's subjective fibromyalgia complaints.  *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011); *Dwigans v. Comm'r of Soc. Sec.*, No. 1:17-cv-454, 2018 U.S. Dist. LEXIS 150585, at * 16 (S.D. Ohio Sept. 5, 2018).  But the ALJ didn't over-rely on the lack of objective exam findings to discount Barger's subjective symptom complaints.  Rather, the ALJ considered the longitudinal record, and gave special attention to Barger's own statements about how his fibromyalgia symptoms were progressing.  SSR 12-2p, 2012 SSR LEXIS 1, at *17; *Swain*, 297 F. Supp. 2d at 990; *see* (Tr. 22-30).  And on the basis of that review, the ALJ reasonably, albeit implicitly, determined that Barger's fibromyalgia was, on balance, "either improving or, at worst, stable."  *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008).

The ALJ also addressed Barger's degenerative disc disease and hand arthritis.  (Tr. 22, 67).  And the ALJ cited evidence that supported the ALJ's decision not to find greater limitations

on account of them, namely, objective exam findings documenting: (i) full lumbar flexion; (ii) no tenderness of the thoracic or lumbar spine; (iii) no joint instability; (iv) intact/normal sensation; (v) normal skeletal range of motion; and (vi) normal gait.  (Tr. 35); *see also* (Tr. 737-38, 836, 881, 1106-07, 1202-03, 1210-11, 1248-49, 1378-79, 1381-82, 1384-85, 1387-88, 1391, 1394).

Although it might have been preferable for the ALJ to have given a more structured explanation for how or why the record was inconsistent with Barger's subjective symptom complaints, the explanation that was given was sufficient to permit the court to assess how the ALJ evaluated Barger's subjective symptom complaints.  SSR 16-3p, 2016 SSR LEXIS 4 at *26. And a review of the ALJ's decision and discussion of the evidence is sufficient to allow the court to conclude that the ALJ fulfilled his obligation to consider all the evidence, did so in compliance with SSR 12-2p and 14-1p, and drew reasonable conclusions regarding Barger's physical RFC.  In short, the ALJ's analysis followed the framework set out in the regulations, was supported by substantial evidence, and was sufficient to create and accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. at 877; *Rogers*, 486 F.3d at 241; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. § 404.1520(e).

### 2.    Mental Impairments

The ALJ also applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Barger's subjective symptom complaints of his mental impairments.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations when he: (i) considered all of Barger's mental health symptoms, including his anger, PTSD flashbacks, and difficulties with memory, concentration and completing tasks; and (ii) stated that he found Barger's statements of the severity of his mental health symptoms inconsistent with other evidence.  20 C.F.R. § 404.1520(e); SSR 16-3p, 2016 SSR LEXIS 4, at

46

*9-10; (Tr. 22-23, 30-31).  Contrary to Barger's argument, the ALJ didn't merely give a

boilerplate explanation for discounting the severity of his alleged symptoms.  Rather, the ALJ

explained:

> [O]ther mental examination findings include appropriate grooming or well
> groomed, being very pleasant, oriented, a full in range, normal or broad affect,
> normal mood, cooperative behavior, an appropriate overall appearance, generally
> related and engaged behavior and manner, clam motor activity, good eye contact,
> a neutral, happy reported mood, unremarkable thought content and process,
> orientation to person, place, time, and situation, appropriate insight and judgment,
> grossly intact memory, and average intellect.  (3F, 37-38; 5F, 8-13; 7F, 2-23; 10F,
> 32-40; 17F 4-14; 18F, 34-44, 46-48, 53-55, 59-61, 64-72; 19f).  In treatment
> records, [Barger] sometimes reported thinking his current medications were
> helping or some improvements in his symptoms, including less outbursts or no
> major outbursts, doing pretty well, and/or having a de[]cent mood.  (2F, 2-7; 7F,
> 2-23; 18F, 34-44, 59-61).

(Tr. 30-31).  In effect, the ALJ discounted Barger's statements about his mental health

impairments because they were inconsistent with unremarkable mental status exam findings in

the record and because of Barger's statements to several providers documenting improvement in

his mental health symptoms.  The ALJ's explanation was sufficient to allow for meaningful

review and was supported by substantial evidence.  *Id.*; *see also* (Tr. 433-34, 735, 738, 805, 825,

878, 881, 1279-80, 1325, 1334, 1337-38, 1344-45, 1350-51, 1355-56, 1358-59, 1361-62, 1377-

94).

    In short, with regard to Barger's mental impairments, the ALJ's analysis followed the

framework set out in the regulations, was supported by substantial evidence, and was sufficient

to build an accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F.

Supp. at 877; *Rogers*, 486 F.3d at 241; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. § 404.1520(e).

## IV.    Recommendation

    Because Barger lacks standing to raise his constitutional challenge and because the ALJ

otherwise applied proper legal standards and reached a decision supported by substantial

evidence, I recommend that the Commissioner's final decision denying Barger's applications for DIB and SSI be affirmed.

Dated: April 21, 2022

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).