UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| **Randy Scott Barger,** | ) | **CASE NO. 21 cv 138** |
| | ) | |
| Plaintiff, | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| Vs. | ) | |
| | ) | |
| **Commissioner of Social Security,** | ) | **Memorandum of Opinion & Order** |
| | ) | |
| Defendant. | ) | |

**Introduction**

This matter is before the Court upon the Report & Recommendation of Magistrate Judge Thomas M. Parker recommending that the decision of the Commissioner be affirmed. (Doc. 16). Plaintiff Randy Scott Barger filed objections. (Doc. 17). This is a disability insurance benefits ("DIB") and supplemental security income ("SSI") case. For the following reasons, this Court ACCEPTS the Report & Recommendation and AFFIRMS the decision of the Commissioner.

**Standard of Review**

When objections are made to a Magistrate Judge's Report and Recommendation, the district court reviews the objection *de novo*. Federal Rule of Civil Procedure 72(b) provides in pertinent part:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended decision; receive further evidence; or return the matter to the magistrate judge with instructions.

As stated in the Advisory Committee Notes: "The term 'de novo' signifies that the magistrate's findings are not protected by the clearly erroneous doctrine, but does not indicate that a second evidentiary hearing is required." (*citing United States v. Raddatz*, 447 U.S. 667 (1980)).

**Analysis**

In the matter before the Court, Plaintiff renews his argument that the ALJ lacked authority to resolve his disability case because the ALJ's authority is derived from a Commissioner subject to an unconstitutional removal provision. He also raises various objections to the ALJ's analysis of his conditions. Each objection will be addressed in turn.

**I.    Separation of Powers**

Plaintiff's first argument is that remand is necessary to correct a constitutional defect. He asserts that the ALJ in his case lacked proper authority because the ALJ derived that authority from Commissioner Saul, who was subject to an unconstitutional removal provision. That provision, 42 U.S.C. § 902(a), protected the Commissioner from removal except in cases of "neglect of duty or malfeasance in office." The government agrees that Commissioner Saul was

2

subject to an unconstitutional removal provision under *Seila Law* because the President must be able to remove the Commissioner at will. Instead, the government argues that remand is unnecessary under *Collin v. Yellen* because Plaintiff fails to show harm resulting from the unconstitutional removal provision.

In *Seila Law*, the Supreme Court held that for-cause removal protections placed upon the Director of the Consumer Financial Protection Bureau violated the separation of powers because the President must be able to remove officers at will. *Seila Law v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020). The Court in *Collins v. Yellen* extended *Seila Law* to for-cause removal restrictions on the Director of the Federal Housing Finance Agency. 141 S. Ct. 1761, 1783 (2021).

But, where remedies are concerned, the Court distinguished between cases involving unconstitutional *appointments* and cases involving properly appointed officers whose *removal protections* were unconstitutional. *Id.* at 1788. An unconstitutionally appointed officer would lack authority to act, but a constitutionally appointed officer with for-cause removal protection still acts with proper authority. *Id.*; *id.* at n.23 ("[T]he unlawfulness of [a] removal provision does not strip [an officer] of the power to undertake the other responsibilities of his office."). When a properly appointed officer has for-cause removal protections, a party may still be entitled to retrospective relief, but the Court held that the party must show that the removal provision inflicted harm. *Id.* at 1788. Action taken by an unconstitutionally appointed officer, by contrast, would require remand. *Id.* (citing *Lucia v. S.E.C.*, 139 S. Ct. 2044, 2055 (2018) (remedy for unconstitutionally appointed ALJ is a new hearing)). In *Collins*, the Court remanded on the issue of harm to determine whether shareholders could establish harm stemming from the

3

unconstitutional removal provision. *Id.* at 1788–89. The Court offered hypothetical ways that the shareholders could show harm: evidence that the President attempted to remove a director but was prevented from doing so by court order, or a statement by the President showing that he would remove a director if the removal protection were not present. *Id.* at 1789.

Here, the government admits that Commissioner Saul was subject to an unconstitutional removal provision, 42 U.S.C. § 902(a). Under *Seila Law* and *Collins*, then, the question becomes what remedy, if any, is appropriate. Plaintiff seeks remand for a new hearing on the basis that the ALJ lacked authority to hear his case because Social Security regulations explain that ALJs derive authority from the Commissioner.

The government argues that Commissioner Saul had full authority to act because he was constitutionally appointed; the error is in his removal provision, not his appointment. In the government's view, *Collins* requires a showing of actual harm when an officer is subject to an unconstitutional removal provision, and Plaintiff failed to show such harm. The Court agrees that Plaintiff is not entitled to relief.

The Supreme Court made clear in *Collins* that a plaintiff who was subjected to an officer's decision, where that officer was protected by an unconstitutional removal provision, will not automatically be entitled to relief. The Court explained that *Seila Law* had ordered a remand to decide whether the challenged action "had been ratified by an Acting Director who was removable at will by the President." *Collins v. Yellen*, 141 S. Ct. 1761, 1788. The Court went on to discuss ways that plaintiffs could be harmed by an unconstitutional removal provision. *Id.* at 1789 ("[I]t is still *possible* for an unconstitutional [removal] provision to inflict

4

compensable harm.") (emphasis added). Ultimately, the *Collins* Court remanded to explore harm. *Id.*

Lower courts have interpreted the *Collins* " compensable harm" requirement to mean that a party must show a "link . . . between the removal provision and [the plaintiff's] case" such that the harm is "particularized to [the Plaintiff]." *See Kaufmann v. Kijakazi*, 2022 WL 1233238, at \* 5 (9th Cir. 2022). As explained above, *Collins* gave several such examples, such as proof that the President tried to remove a particular officer but was prevented from doing so by a court order. *Kaufmann* provided other hypotheticals, such as the President taking special interest in a plaintiff's case or the Commissioner directing the Appeals Council to "decide her case in a particular way because of the statutory limits on the President's removal authority." *Id.*

The government points to no fewer than thirty cases wherein lower courts have held that the unconstitutional removal provision protecting the Commissioner of Social Security did not cause compensable harm. (Doc. 18 at 1588 n.3). Those cases, relying on *Collins,* consistently find that plaintiffs fail to show a nexus between the removal provision and the adverse decision in their benefits case.[1] *See, e.g.*, *Crawford v. Comm'r of Soc. Sec.*, 2021 WL 5917130, at \*8 (S.D. Ohio Dec. 14, 2021), *report and recommendation adopted by* 2022 WL 219864 (S.D. Ohio Jan. 25, 2022). This Court, too, recently rejected an identical argument. *Sharpe v. Comm'r of Soc. Sec.*, 2022 WL 2127960 (N.D. Ohio June 14, 2022).

---

[1] Justice Kagan predicted such a result in her *Collins* concurrence: "I doubt the mass of SSA [Social Security Administration] decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference." *Collins v. Yellen*, 141 S. Ct. 1761, 1802 (2021) (Kagan, J., concurring).

5

Plaintiff's sole rebuttal case, *Tafoya v. Kijakazi*, merely held that a plaintiff had standing to litigate her constitutional challenge to the removal provision. 551 F. Supp. 3d 1054, 1062 (D. Colo. 2021). Indeed, the court expressed doubt that the plaintiff would later succeed on the merits. *Id.* at 1059 ("While ultimately, the righteousness *vel non* of her arguments on the merits may gain plaintiff little, if anything, the question before me is one of standing, and thus does not implicate the merits.").

Plaintiff makes no argument that he suffered a particularized harm as a result of the unconstitutional removal provision. He does not argue that the President took interest in his case, or that the Commissioner acted in a particular way because he knew that he could only be removed for cause. He argues solely that the ALJ lacked authority to decide his case because the Commissioner similarly lacked authority. But this argument conflates an error in the Commissioner's appointment—which would have deprived the Commissioner of authority to act—with an error in the removal provision, which does not deprive the Commissioner of authority. *Collin v. Yellen*, 141 S. Ct. 1761, 1788 (2021). The Court concludes that Plaintiff, having failed to allege a particularized injury caused by the removal provision, is not entitled to remand for a new hearing.

## II. Mental Impairments

Plaintiff also objects to the ALJ's conclusion that Plaintiff's mental impairments were merely moderate instead of serious. He argues that "the facts cited by the ALJ in support of his findings that Plaintiff only had moderate limitations was [sic] incorrect and not based on the record," and further that "[t]he actual evidence supported greater limitations . . . ." (Doc. 17 at 1582). In particular, Plaintiff argues that the ALJ incorrectly concluded that he could cook for

6

himself, because the record indicates that Plaintiff did not trust himself to cook. Plaintiff believes that this warranted a "marked" limitation rather than a "moderate" limitation regarding his capacity to care for himself. Plaintiff also believes that the ALJ discounted evidence of his aggression, which Plaintiff believes should have led to a conclusion that his ability to interact with others is markedly limited.

The government responds that the ALJ's finding that Plaintiff could cook for himself is not inconsistent with Plaintiff's lack of trust in himself to do so. On the matter of Plaintiff's aggression, the government argues that the ALJ "explicitly considered the evidence of Plaintiff's aggression and temper." (Doc. 18 at 1591).

A reviewing court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Colvin v. Barnhart*, 475 F.3d 727, 729–30 (6th Cir. 2007) (quotation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). When substantial evidence supports the Commissioner's conclusion, "we must defer to that decision even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (quotation omitted).

First, the Court concludes that the ALJ did not err regarding Plaintiff's ability to care for himself. Plaintiff's only objection to this limitation is that the ALJ's finding that Plaintiff could cook for himself was inconsistent with his assertion that he did not trust himself to cook. But the government correctly points out that Plaintiff also testified that he could prepare simple meals for himself. (Doc. 11 at 136) (Plaintiff testifies that he can "make a mean bologna sandwich," grill a

7

burger, and make macaroni and cheese). Therefore, the ALJ's statement that Plaintiff "testified that he could prepare simple meals" is entirely consistent with the record and supported by substantial evidence. (Doc. 11 at 94). The ALJ did not err regarding Plaintiff's ability to care for himself.

Second, the Court concludes that the ALJ appropriately considered evidence of Plaintiff's temperament when evaluating his ability to interact with others. Plaintiff essentially argues that the ALJ should have concluded that his ability to interact with others was markedly limited because he "was noted to have physical aggression, verbal aggression, and explosive temper" as well as "homicidal thoughts." (Doc. 17 at 1581). But this argument asks the Court to re-weigh the evidence. The ALJ explicitly considered Plaintiff's evidence:

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant testified that he experienced anxiety and he reported difficulty with handling stress and changes in routine, anger, and outbursts. At times, the claimant had a depressed and/or anxious mood, a labile affect, and occasional homicidal thoughts when angry. However, at other times, the claimant was found to have appropriate grooming or well groomed, being very pleasant, oriented, a full in range normal or broad affect, normal mood, cooperative behavior, an appropriate overall appearance, generally relaxed and engaged behavior and manner, calm motor activity, and appropriate insight and judgment.

(Doc. 11 at 95). It is clear from this analysis that the ALJ weighed evidence of Plaintiff's hostility but considered it largely outweighed by ample evidence of appropriate behavior, meriting a moderate limitation in his ability to interact with others. The Court concludes that the ALJ's determination is supported by substantial evidence.

**III.　Obesity**

Plaintiff also argues that the ALJ erred generally when discussing Plaintiff's obesity and concluding that it did not satisfy any of the listings. Specifically, Plaintiff believes that the ALJ failed to address "a relationship between Plaintiff's obesity and his other impairments, specifically the swelling in his hand and feet . . . chronic pain, anxiety, and insomnia . . . ." (Doc. 17 at 1582). He argues that the Report & Recommendation acknowledged that the ALJ "could have said more about Plaintiff's obesity." (Id.). Regardless, the Report & Recommendation concluded that substantial evidence supported the ALJ's conclusion.

The Court finds that the ALJ did not err in discussing Plaintiff's obesity. SSR 19-2p sets out guidelines for evaluating cases involving obesity. 2019 WL 2374244. The guidance notes that obesity itself is not a listed impairment but may operate with other impairments to equal a listing or increase the severity or functional limitation of another impairment. The guidance "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009) (quotation omitted). An ALJ "must specifically take into account the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment and consider how fatigue may affect the individual's physical and mental ability to sustain work activity . . . ." *Shilo v. Comm'r of Soc. Sec.*, 600 Fed. App'x 956, 959 (6th Cir. 2015).

The ALJ stated that he "considered the claimant's obesity at all steps of the evaluation process, as outlined in SSR 19-2p." (Doc. 11 at 94) He then concluded that there was "no evidence that the claimant's obesity alone, or in combination with another impairment, meets or

9

medically equals a listing." (Id.). Later, the ALJ documented the facts regarding Plaintiff's "severe impairment of obesity," which included Plaintiff's weight, BMI, and treatment records of morbid obesity. The ALJ concluded that Plaintiff's obesity caused "greater functional limitations that might be expected from his other severe impairments alone," which the ALJ "accounted for in the residual functional capacity articulated above." (Id. at 101).

The ALJ also accounted for Plaintiff's obesity when discussing functional limitations. He mentioned obesity when discussing Plaintiff's ability to lift weight, stand or walk, sit, and climb, among other limitations. (Doc. 11 at 105). He acknowledged treatment notes from Dr. Dornan indicating morbid obesity.

Plaintiff argues that the ALJ should have gone further and discussed a relationship between Plaintiff's obesity and his swelling, chronic pain, anxiety, and insomnia. He insists that "the combination of these problems imposed greater problems." (Doc. 17 at 1582).

The Sixth Circuit has concluded that an ALJ erred in evaluating obesity where treatment records were inconsistent with the ALJ's conclusions that a claimant could walk without issue. *Shilo*, 600 Fed. App'x at 962. In that case, the ALJ concluded that the claimant had no ambulation problems, despite objective evidence that the claimant's obesity prevented normal walking. *Id.*

But here, Plaintiff fails to explain why the ALJ should have discussed specific interactions between his obesity and other conditions. Although he cites numerous treatment notes for his disorders, he does not explain how these notes suggested interactions between obesity and such disorders. This Court's own review similarly fails to reveal such evidence. It does not appear, for example, that any of the physicians specifically indicated an interaction

10

between Plaintiff's obesity and another impairment such that the ALJ must specifically discuss obesity when evaluating that impairment.

Regardless, the ALJ accounted for Plaintiff's obesity in numerous sections of the opinion, noted that Plaintiff's obesity was severe, and explicitly acknowledged that Plaintiff's obesity likely exacerbated other conditions. The ALJ did not violate SSR 19-2p in discussing obesity.

**IV. Dr. Dornan's Opinion**

Plaintiff also argues that the ALJ failed to adequately support his conclusion that the opinion of treating physician Dr. Dornan was inconsistent with the available evidence. He asserts that the ALJ "failed to make clear with accurate arguments as to why he found" Dr. Dornan's opinion unpersuasive. (Doc. 17 at 1584). He argues that the ALJ simply listed a series of pages in the record instead of explaining why Dr. Dornan's findings were inconsistent with findings from other providers. According to Plaintiff, some of these record citations actually support Dr. Dornan's findings.

The government responds that the ALJ's opinion reasonably concluded that Dr. Dornan's opinion was ultimately inconsistent with the evidence while acknowledging that some evidence supported the opinion. The government contends that Plaintiff is asking the Court to re-weigh evidence.

Agency regulations provide that an ALJ, when considering medical opinions, must "articulate how [he] considered the medical opinions and prior administrative findings." 20 C.F.R. § 404.1520c(a). In this analysis, "[t]he most important factors" are the persuasiveness and supportability of these opinions. *Id*. Supportability involves the medical source's own justifications and medical evidence for the source's opinion. § 404.1520c(c)(1). Consistency

11

involves comparing the source's opinion to the findings of other sources. § 404.1520c(c)(2). The ALJ is required to "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions . . . ." § 404.1520c(b)(2).

Dr. Dornan opined that Plaintiff needed unscheduled breaks every 30 minutes because of muscle weakness, chronic fatigue, pain, paresthesias, and numbness. He further opined that Plaintiff's legs would need to be elevated for 50% to 60% of the workday, he would need a cane for walking all of the time, Plaintiff would be off-task at least 25% of the time, Plaintiff was incapable of even low-stress work due to pain, and Plaintiff's PTSD would be exacerbated by "large groups and closed rooms." (Doc. 11 at 106).

The ALJ concluded that Dr. Dornan's opinion was unpersuasive because it was not consistent with a wide range of clinical findings:

> It is not supported by clinical findings that include no joint deformities, rheumatoid nodules, clinical synovitis, or knee effusions, full lumbar flexion was full, no percussion tenderness to the thoracic or lumbar spine, no instability to any upper or lower extremity joints, negative Tinel's and Finkelstein tests, intact sensation to fine touch or normal sensation, a normal toe and heel walk, normal musculoskeletal range of motion with normal strength, no tenderness, swelling or deformity, a normal gait, normal motor function, lungs clear to auscultation, normal pulmonary effort, normal breath sounds, no respiratory distress, clear bilateral breath sounds, no decreased breath sounds, and no acute distress.

(Doc. 11 at 106). The ALJ concluded that Dr. Dornan's opinion was partially inconsistent with his own findings, which did not support such limitations. The ALJ specifically noted that a recent examination by Dr. Dornan indicated normal neck range of motion, no acute distress, and no lower extremity edema. He also noted that Dr. Dornan's proffered mental limitations were not consistent with findings that Plaintiff "consistently . . . was noted to have a normal mood and

12

affect or normal behavior." (Id.). The ALJ found the opinion consistent with Plaintiff's testimony but found that it was only partially supportable by his own findings and was not at all consistent with the state agency physician opinions. (Doc. 11 at 106).

Magistrate Judge Parker concluded that the ALJ validly resolved a conflict in the support for Dr. Dornan's opinion, and that Plaintiff's objection amounted to asking the Court to re-weigh the evidence for and against the opinion. He noted that the ALJ "cited unremarkable objective exam findings in Dr. Dornan's other treatment notes" and that Dr. Dornan's own findings around the time his opinion was offered did not support that opinion. Although the ALJ acknowledged that Dr. Dornan's opinion was somewhat consistent with Plaintiff's testimony and Dr. Dornan's own findings, Magistrate Judge Parker concluded that the ALJ was entitled to find the opinion unsupported by the weight of the evidence.

Plaintiff objects that "the ALJ did not explain that Dr. Dornan's findings were inconsistent with the objective findings of other treatment providers . . . " and instead "listed a series of pages in the record." (Doc. 17 at 1583).

The Court agrees with the conclusions of the R&R. The ALJ provided a long list of negative results that were inconsistent with Dr. Dornan's opinion, both in the context of inconsistent opinions offered by state agency physicians and when discussing Dr. Dornan's opinion directly. (Doc. 11 at 105–106). The ALJ also found that some of Dr. Dornan's treatment notes, rendered close in time to his opinion, did not support that opinion because his examination findings "included generalized tenderness to the upper and lower extremities and bilaterally and morbid obesity," while also including "normal neck range of motion, no acute distress, and no lower extremity edema." (Id.). Although Plaintiff correctly notes that some of the cited treatment

13

records support Dr. Dornan's opinion, the ALJ validly articulated reasons for finding that the contrary conclusion was supported by substantial evidence.

As for mental limitations, the ALJ found Dr. Dornan's opinion was not supported by findings as "consistently the claimant was noted to have a normal mood and affect or normal behavior." Dr. Dornan's opinion was inconsistent with conclusions from the state agency physicians, who determined that Plaintiff "was able to maintain sufficient concentration, persistence, and pace to carry-out a learned routine in a structured setting without high-paced production demands under normal levels of supervision." (Id. at 106–07).

In sum, the ALJ satisfied the medical opinion regulation by discussing the supportability and consistency of Dr. Dornan's opinion. Furthermore, the ALJ's opinion in this regard was supported by substantial evidence.

**V.  Dr. Hunt's Opinion**

Finally, Plaintiff asserts that the ALJ erred in his conclusion that opinions offered by Dr. Hunt were unpersuasive. He raises a similar objection to the one raised regarding Dr. Dornan, namely that the ALJ did not clearly explain why Dr. Hunt's opinion was inconsistent with the record.

The government responds that the ALJ "reasonably applied the controlling regulations, and discounted Dr. Hunt's opinions as inconsistent with and unsupported by the record evidence generally." (Doc. 18 at 1592).

Dr. Hunt opined that Plaintiff was "seriously limited" in a variety of mental capacities, had "no useful ability to function" with others, was "unable to meet competitive standards for interacting appropriately with the general public," and "had no useful function with accepting

instructions and responding appropriately to criticism from supervisors or getting along with coworkers or peers." (Doc. 11 at 107). He believed Plaintiff would be absent once or twice weekly and off task for 20% of an eight-hour workday. He noted diagnoses of PTSD, intermittent explosive disorder, and unspecified mood disorder, based on findings of flashbacks, nightmares, irritability, avoidance of public situations, and history of triggered anger outbursts.

The ALJ found Dr. Hunt's opinion unpersuasive:

> [it is] not supported by mental status examination findings that include appropriate grooming or well groomed, being very pleasant, oriented, a full in range, normal or broad affect, normal mood, cooperative behavior, an appropriate overall appearance, generally relaxed and engaged behavior and manner, calm motor activity, good eye contact, a neutral, happy reported mood, unremarkable thought content and process, orientation to person, place, time, and situation, appropriate insight and judgment, grossly intact memory, and average intellect.

(Doc. 11 at 108). To support this conclusion, the ALJ cited a litany of medical findings, which included treatment notes from other providers as well as by Dr. Hunt. He also wrote that Dr. Hunt's opinion was not consistent with the findings of the state agency physicians, but was "somewhat consistent" with Plaintiff's testimony.

The Court concludes that the ALJ adequately discussed his reasons for rejecting Dr. Hunt's opinion. The ALJ compared Dr. Hunt's conclusions to numerous contrary findings in the record, both in Dr. Hunt's own records and in records by other providers. He also contrasted Dr. Hunt's opinion with the opinions of the state agency physicians, both when discussing Dr. Hunt's opinion and when discussing why he found the state agency opinions persuasive.

Plaintiff cites to *Smalley v. Comm'r of Soc. Sec.*, 2021 WL 4026783 (6th Cir. 2021) in support of his position that remand is required. In *Smalley*, the claimant's physician opined that the claimant could not sit for more than a few hours. In rejecting the opinion, the ALJ noted only

15

that the physician had previously observed a normal gait. The Sixth Circuit determined that remand was required because a normal gait is not necessarily relevant to a claimant's ability to sit, and the ALJ provided no additional analysis. *Id*. at *3 (6th Cir. 2021). Here, the ALJ offered far more reasons for rejecting Dr. Hunt's opinions, both for inconsistency with the record and for lack of internal supportability. The ALJ satisfied the regulation by discussing Dr. Hunt's opinion, and this conclusion is supported by substantial evidence.

**Conclusion**

This Court, having conducted de novo review of Plaintiff's objections and having found no clear error in the remainder of the Report and Recommendation, ACCEPTS the Report and Recommendation. (Doc. 16). In accordance with that recommendation, judgment is entered in favor of the Commissioner for the reasons stated by the Magistrate Judge, and the Report and Recommendation is incorporated herein by reference.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge
Chief Judge

Date: July 21, 2022